FLOYD DIXON *v.* STATE OF INDIANA.

[No. 175S32. Filed June 16, 1976.]

*Stephen Johnson,* Deputy Public Defender, *Biddinger & Johnson,* of Marion, of counsel, for appellant.

*Theodore L. Sendak,* Attorney General, *Harry John Watson, III,* Deputy Attorney General, for appellee.

DeBruler, J.—Appellant, Floyd Dixon, was charged by information with rape, Ind. Code § 35-13-4-3, Burns § 10-4201 (Supp. 1975). He was tried by jury and found guilty. He was sentenced to a term of twelve years.

On appeal, appellant raises two issues: (1) whether there was sufficient evidence of probative value to sustain appellant's conviction for rape, and (2) whether the trial court abused

its discretion and committed reversible error, when it permitted the victim's mother, who was the State's first witness, to remain in the courtroom during the entire trial, after appellant's motion for a separation of witnesses.

Appellant argues that the evidence was insufficient because the victim's testimony was uncorroborated; because appellant's alibi testimony was corroborated by two witnesses; and because the State failed to prove that the intercourse was by force and against the woman's will.

As is well known, we do not sit as a second jury weighing the evidence and determining the credibility of witnesses. Rather, we determine only whether there was sufficient evidence of probative value for the jury to find present each of the elements of the crime and to identify the defendant as the perpetrator of the crime beyond a reasonable doubt. We consider then that evidence of probative value which may have been credited by the jury.

On October 23, 1973, in the evening, the young woman who was the victim in this case, a sixteen year old, high school junior, was driving home from a sorority meeting at her high school. On her way, she stopped and bought some gas and then stopped again at Hank's and bought some milk. She then intended to go home and was driving in that direction, when a car behind her flashed its front headlights at her. She stopped because she thought something was wrong with her car. This was about 9:30 p.m.

A young Black man got out of the car. He looked a little like an old friend of hers from a distance, but she realized he was not as he came closer. She had opened her door a little way. The man told her that gas was leaking from her car. She thought perhaps the gas station attendant had forgotten to replace the gas cap, and she opened the door further and put out one foot to look back. Seeing nothing, she thanked the man and started to close the door. The man stuck a butcher knife in her face and told her to slide over, get

down on the floor in the front seat, and not look at him. She got down facing him. He held the knife in his hand on the seat near her head. At this point, they were parked near a street light and had the dome light in the car on until he closed the door. In these first minutes, he called her by her first name and told her that he and his friends had been watching her and that he knew she went to the high school.

He started to drive, making many turns, and she asked him if he were going to kidnap or kill her. When he said he was not, she asked what he wanted, and he laughed. She kept looking up at him as he answered, and he would tell her to put her head down. The dashboard lights were on as they drove.

After five minutes, he stopped in an isolated place where the woman could see some trees and the Giant watertower. The man reached over and locked her door. He told her to sit up on the seat, take her pants off, and lie down on the seat. She was very scared, but asked him if she had to. And, he told her to just do as he said and she would not get hurt. She asked him to put his knife down, because she was afraid he would stab her. He put it up on the dashboard. Then, he had intercourse with her. After a while, he told her to put on her pants. He took up his knife again and told her to get back down on the floor. He started driving again, and she asked him where he was taking her. She talked to him, and he answered her some of the time. He said he would meet her at the same place the following night, and she said maybe. Finally, he took her back to within two blocks of his car. She asked him to put his knife in his left hand as he got out, because she did not trust him. He did so, and she quickly locked the door and drove home.

She was extremely upset, but was able to tell her mother what had happened. Her mother called the police, who came and searched her car thoroughly. They found a pack of Salem cigarettes, which might have belonged to the assailant. They could not find any fingerprints because none of the surfaces

of the car which the man had touched were smooth. The woman went to the hospital for tests. The doctor testified that the tests were positive, showing that intercourse had occurred in the previous few hours. She then went to the police station and looked through three mug books, containing a total of 225 photographs, but she saw no one who looked like her assailant. (There was no photograph of appellant in the book.) She described her assailant's car as dark blue with a white top, and not old. She also described her assailant's height, weight, clothes and stubbly hair on his face, with no beard or mustache.

Five days later, on Sunday, October 27, 1973, two Black men drove slowly by the young woman's house looking at it. Both her mother in the kitchen and her father in the garage saw them. The men turned around and drove slowly back. Then they stopped in front and looked at the house. Her father walked down to the street and noted the license number as they drove away. He called the police and gave the number, 27A8751, and a description of the car, a white and black Pontiac Bonneville, to the police. He set off in his own car with a CB radio, located the car at Hank's about ten to fifteen minutes later, and called the police. The police came, talked to the driver, and determined that his registration did not match the license on his car. However, the officer did not arrest him, because the car was in the store parking lot on private property and was not in motion. The rape victim never saw this driver, although she knew his name was Floyd Dixon. The license plate belonged to appellant.

On November 23rd, a month after the rape occurred, a police officer brought five new mug shots to the woman's house. All five were of young Black men. She looked at them and told him that one of the men, appellant, looked familiar, but that she did not want to identify him positively until she had seen him in person.

The police arranged a lineup of six Black men and one Latin American. The victim and several other people ob-

served the men. None of the spectators said anything during the period of viewing. Each of the persons involved went in separate rooms and wrote down the number of the person whom they recognized. The victim recognized appellant and only then learned that his name was Floyd Dixon, the same as the man who had driven by her house after the rape.

Three weeks before the present trial, the victim and her mother attended another rape trial in which appellant was the defendant. In that trial, the rapist had used the same modus operandi, the flashing of headlights. Appellant was acquitted.

Cross-examination of the defense witnesses brought out the fact that appellant smoked Salems. Also, in October, 1973, the woman with whom appellant lived had two cars: a 1970 or 1971 Ford, dark blue with a white top, and a Pontiac Bonneville.

We will consider separately each of appellant's three sufficiency arguments. The testimony of the rape victim concerning the crime was not corroborated by eyewitnesses. In Indiana, the uncorroborated testimony of a rape victim is sufficient evidence to support a conviction. *Lynch* v. *State,* (1974) 262 Ind. 360, 316 N.E.2d 372, and cases cited therein. Such a rule conforms to the reality of the circumstances of a rape. Seldom are there any witnesses except the victim and her assailant. When the alleged victim and the defendant are the only witnesses, the jury must determine which witness is telling the truth. The jury may reasonably believe the uncorroborated testimony of one witness, either the victim or the defendant.

In this case, the victim's testimony was corroborated in part by circumstantial evidence. She described her attacker's car as dark blue with a white top, and the woman whom appellant lived with had such a car. The victim described skinny trees and a view of a certain water tower which she could see at the scene of the rape. Later, she was able to show

the police a place where the view was the same. This secluded alley was two blocks from appellant's home. The victim said that she had had intercourse, and the hospital tests showed that she had had intercourse at most a few hours before the tests were taken. Her visual identification of appellant as the rapist was also corroborated by the finding of a Salem pack in her car and the testimony that appellant smoked Salems. Her identification was further corroborated by the testimony that two Black men stopped in front of the woman's house and looked at it five days after the rape. When her father located the car ten to fifteen minutes later, appellant was the driver. The victim's identification of him was independent of this event and about three weeks later. All of this circumstantial evidence makes the woman's testimony more credible.

Although appellant's alibi testimony was corroborated by one witness in full and another witness in part, that combination of three witnesses is not determinative. Common sense tells us that two people may lie or tell only part of the truth to protect another person. The jury could find that the testimony of one person was more credible than the testimony of three who corroborated each other's explanations. *Vicory* v. *State,* (1974) 262 Ind. 376, 315 N.E.2d 715.

To prove rape the State must show penetration forcibly against the will of the woman. Ind. Code § 35-13-4-3, *supra.* The State showed that appellant had a butcher knife which he stuck in the woman's face, so that she would let him in her car. He drove with that knife in his hand and near her head. He drove to a secluded place and locked the doors. He told her to take off her pants, get up on the seat, and do as he said and she would not get hurt. While he had intercourse with the woman, he put the knife on the dashboard at her request. Immediately afterwards, he took the knife up again.

Such intercourse was by force and against the will of the woman. There is no requirement that a woman scream or

physically resist, when by such an act she may very well anger or frustrate her assailant and thereby endanger her life further. The majority of rape victims value their lives more than their right to be free from forced intercourse, just as the majority of robbery victims, for example, value their lives more than their right to keep property that is rightfully theirs. There is absolutely no evidence that the woman in this case would have remained with her captor and consented to have intercourse had she been able to leave safely. She was sixteen years old at the time of this attack and acted rationally, verbally resisting and pleading. We find that there was sufficient evidence of probative value to prove that appellant was the man who raped the woman in this case and that he did so "forcibly against her will."

Appellant's second argument is that the trial court abused its discretion and committed reversible error when it permitted the mother of the rape victim to remain in the courtroom during the trial and to testify for the State, after appellant had moved for a separation of witnesses.

Before the first witness was called, appellant moved for a separation of witnesses. The State asked that the young woman who allegedly was raped be allowed to sit at the counsel table. The State asked also that her mother, who would be the State's first witness, be allowed to stay too. Appellant objected to the mother's remaining in the room if she was to be a witness. The State noted that the young woman was sixteen. The court excused the jury and held a bench conference. As a result, the young woman's mother was allowed to remain in the courtroom, although the motion was granted with regard to all other witnesses.

The principal purpose of a separation of witnesses is to keep later witnesses from hearing the testimony and questioning of earlier witnesses. The victim's mother was the first witness called, and she was never recalled. Nothing

occurred between the order to the other witnesses to leave the room and the calling of the mother as a witness. Therefore, the mother's testimony was not affected by the judge's permitting her to stay.

Appellant argues in his brief that the victim's own testimony was affected by the judge's order. Clearly, she was allowed to hear all the testimony which preceded hers. Had her mother left the room after testifying, the victim still would have heard her testimony. If her mother had not been a witness, her mother would have been allowed to stay in the room while the victim testified. Appellant states:

> "One, only has to read the transcript of evidence in its entirety to determine, that . . . [the] mother of the alleged rape victim . . . who was only sixteen (16) years of age, was a great influence on her and her presence undoubtedly affected the testimony which was given by . . . [the victim] which ultimately had to be prejudicial to the Appellant.

> It should be noted that . . . [the mother] and her husband, had participated in the investigation that lead to the Appellant's arrest and that she and her daughter had further attended a trial of Appellant on a separate and different rape charge, wherein Appellant was acquitted, approximately three (3) weeks prior to the trial of this case, where their presence was only that of interested spectators. Human nature clearly dictates that a young person, sixteen (16) years of age, and giving testimony before a jury as to a sex act, is going to have her testimony influenced by the presence of a parent in the Court Room. Clearly, to allow the mother of . . . [the victim] to remain in the Court Room and to further testify was prejudicial to the Appellant and is reversible error."

This argument has nothing to do with the order for a separation of witnesses. Although it is not clear, presumably appellant is arguing that the victim lied about the forced intercourse because her mother was present. There is absolutely no evidence of this in the record; appellant presented an alibi defense. The victim's mother's presence at trial did not change the victim's explanation of the circumstances of the

crime. Appellant had taken her deposition earlier and did not impeach her testimony.

The trial court did not abuse its discretion when it permitted the mother of the young rape victim to remain in the room after she had testified.

We find no error and affirm the judgment of the trial court.

Givan, C.J., Arterburn, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 348 N.E.2d 401.