SANDY PAUL BRUCE *v.* STATE OF INDIANA.

[Nos. 1075S261; 1075S227. Filed April 19, 1978.]

DeBruler, J.—Appellant has perfected separate appeals
from conviction of two counts of first degree murder, Ind.

Code § 35-13-4-1 (Burns 1975), repealed October 1, 1977, (No. 1075 S 261) and of rape, § 35-13-4-3 (Burns 1975), and armed rape, § 35-12-1-1 (Burns 1975) both repealed October 1, 1977, (No. 776 S 227). We have consolidated these appeals because several issues require a consideration of the circumstances of both cases.

On February 4, 1974, an elderly couple, Stanley and Lillian Machin, were murdered in their Beverly Shores, Indiana, home. Appellant, a Michigan City resident, was arrested on February 12 in Tuscaloosa, Alabama, by the F.B.I. He was charged with two counts of (premeditated) first degree murder by indictments filed in the Porter Superior Court. Appellant entered pleas of not guilty and not guilty by reason of insanity. He filed a motion for change of venue from the county, which was denied. Appellant was tried by jury from April 7-14, 1975, and was found guilty as charged. He was sentenced to life imprisonment on each conviction.

On December 7, 1973, a man had entered a house near the Machin residence, held a man and woman at gunpoint, and raped the woman. After appellant was returned to Indiana upon his arrest he appeared in a line-up and was identified by the victims of this incident. The rape victim testified at appellant's murder trial regarding the December 7 offenses. Appellant was charged with rape and armed rape on March 6, 1974. His motion for change of venue was granted and the case was transferred to Cass County. Appellant was tried by jury in the Cass Circuit Court on February 3 and 4, 1976, found guilty as charged, and sentenced to an indeterminate term of two to twenty-one years for the rape and a determinate term of twenty-five years for the armed rape, these sentences to run consecutively.

The facts relating to the Machin murders are as follows. The Machins lived in Beverly Shores, a community on the Lake Michigan shore consisting largely of summer homes. On February 3, 1974, the Machins were visited by their son, who last saw them alive that evening. In the early morning hours

of February 4, a man appeared at the home of James Whitehouse, superintendent of the Indiana Dunes National Lakeshore and a neighbor of the Machins. The man told the Whitehouses that he had been in an automobile accident in which his wife had been trapped, but left before the Whitehouses could call the police. A Beverly Shores town marshall whom Mr. Whitehouse called found a Chevrolet pick-up truck sitting abandoned in a ditch in the Beverly Shores area. The truck was registered to Mrs. Alicefaye Bruce, appellant's wife.

Later that day a Mercury Cougar automobile registered to Stanley Machin was found, apparently abandoned, in Michigan City near appellant's house. The Michigan City police unsuccessfully tried to telephone the Machins to inquire about the car. On the afternoon of February 5 a Michigan City detective and a Beverly Shores marshall went to the Machin residence. They found the bodies of Stanley Machin, 75, and his wife, Lillian, 71. Mr. Machin was bound with a blanket and telephone cord and was lying on a couch; Mrs. Machin lay naked on a bed in another room. Both died of massive shotgun wounds to the head, and a spent shotgun shell lay near each body. The time of their deaths could not be established with certainty. A deputy coroner believed that the deaths occurred between mid-morning and mid-evening of February 4, but possibly earlier. A forensic pathologist found little evidence from which to fix the time of death, but upon being pressed for an opinion gave noon of February 5.

Appellant's fingerprints were discovered on the Machins' refrigerator and the interior of their Cougar. Mrs. Whitehouse identified appellant as the man who came to her house claiming to have been in an accident. Police and F.B.I. agents went to appellant's Michigan City residence, the home of Mrs. Bruce's mother, and although appellant was not there, Mrs. Bruce gave them some men's clothing, a box of shotgun shells, and a ring of car keys from appellant's bedroom. They found a shotgun, purchased by Mrs. Bruce and bearing appellant's fingerprints, in the garage. The shotgun was loaded with

several live shells. These, together with the shells obtained from Mrs. Bruce and the spent shells found at the scene of the killings, were all high brass-based, twelve gauge Winchester & Western, number six shot. One of the spent shells found in the Machin home was identified by an F.B.I. firearms expert as having been fired from the shotgun found in the garage. The clothing contained particles of glass which another F.B.I. technician testified matched broken glass found in the Machin kitchen. The car keys fit the ignition and locks of the Cougar.

Around noon of February 4 appellant closed his savings account in a Michigan City bank, withdrawing one thousand dollars in cash. He traveled to Alabama and obtained a job on a tugboat, where he was arrested by the F.B.I. on February 12.

The events involved in the rape offenses occurred some two months earlier on December 7, 1973. William Dunne, who was renting a Beverly Shores house near the Machin house, was having dinner with CEP, a young woman of his acquaintance, that evening. He answered a knock at the door and found appellant aiming a shotgun at him. Appellant entered the house and ripped out the two telephones. He told the young couple that he was a Mafia killer sent to kill someone named "Ron", who was not there, and intimated that he would kill them instead. He bound Dunne with the telephone cord as Dunne lay on a bed, then took CEP to another bedroom. Appellant had CEP disrobe and raped her on a couch. Then he bound her with strips torn from a blanket, left the house for one and one-half minutes, and returned to rape her again. He left the house, having spent about one and one-half hours there.

In his appeal from his murder convictions, No. 1075 S 261, appellant raises numerous issues, which we have regrouped and renumbered.

(1) Propriety of the trial court's disposition of appellant's

motion to dismiss the indictment for lack of jurisdiction, and sufficiency of the evidence to show jurisdiction;

(2) Denial of appellant's motion for change of venue from the county on grounds of prejudicial publicity and alleged trial court misconduct in the hearing thereon;

(3) Timeliness and sufficiency of the State's response to appellant's notice of intent to offer alibi evidence;

(4) Failure of the trial court to conduct hearings on appellant's motions to suppress identification testimony;

(5) Adequacy of the remedy provided appellant for the State's failure to disclose two photographs and the name of a witness pursuant to a trial court discovery order;

(6) Failure of the trial court to conduct hearings on appellant's motions to suppress evidence of appellant's fingerprinting while in custody and of a search of a pick-up truck owned by appellant's wife;

(7) Failure of the trial court to inquire into possible prejudice engendered among the jurors by several newspaper articles published during trial;

(8) Alleged trial court misconduct during the examination of witnesses at trial;

(9) Failure of the trial court to inquire into possible prejudice engendered among the jurors by the fainting of a spectator during trial;

(10) Failure of the trial court to inquire into possible prejudice engendered by jurors overhearing conversation in the audience during trial;

(11) Failure of the trial court to inquire into possible prejudice engendered among the jurors by the entry of the bailiff into the jury room during deliberations to make coffee;

(12) Admissibility of a shotgun seized by police from a garage used by appellant;

(13) Admissibility of clothing, shotgun shells, and keys obtained by police from appellant's wife;

(14) Adequacy of the chain-of-custody and relevancy of several items of evidence;

(15) Admissibility of evidence suggesting that Mrs. Machin had been raped by her murderer, and showing that appellant had raped a woman two months earlier under circumstances asserted to be similar;

(16) Admissibility of evidence that appellant went to Alabama around the time of the murders, and propriety of an instruction on flight;

(17) Refusal of the trial court to declare a mistrial because of prosecutorial misconduct and evidentiary harpoons;

(18) Sufficiency of the evidence of appellant's identity and of the element of premeditation; variances between the pleadings and proof;

(19) Propriety of instructions defining malice and premeditation;

(20) Deletion by the trial court of part of appellant's instruction on the consideration of fingerprint evidence;

(21) Refusal of appellant's tendered instruction on the presumption raised by failure to produce available witnesses and evidence;

(22) Refusal of part of appellant's tendered instruction on the State's burden of proof;

(23) Eligibility of appellant for treatment as a criminal sexual deviant in lieu of punishment for appellant's murder convictions.

In his appeal of his rape and armed rape convictions, No. 776 S 227, appellant raises three additional issues:

(24) Overruling of appellant's motion to suppress the identification testimony of the State's witnesses because of their confrontation with appellant in a pre-trial line-up allegedly conducted;

(a) in contravention of appellant's right to the presence and assistance of counsel; and

(b)   during an illegal detention of appellant;

(25)   Subjection of appellant to double jeopardy by his conviction for the same acts admitted into evidence in his murder trial;

(26)   Propriety of multiple sentencing for rape and armed rape.

## I.

The Machins' house was located in the Indiana Dunes National Lakeshore. Before trial appellant moved to dismiss the indictment on the ground that the offenses alleged occurred on federal property, within a national recreational facility, and that the Indiana State court had no jurisdiction over such offenses.

Indiana Code § 35-3.1-1-4(a)(8) (Burns 1975) provides for testing the jurisdiction of the court by motion to dismiss. Indiana Code § 35-3.1-1-8(e) and (f) (Burns 1975) require the trial court to hold an evidentiary hearing and make findings of fact, unless *inter alia*:

"The moving papers do not allege a ground constituting a legal basis for the motion pursuant to section 4 of this chapter...." Ind. Code § 35-3.1-1-8(e)(1).

We construe this section to authorize the trial court to deny a motion to dismiss without a hearing when, accepting the facts asserted by the motion as true, the court can nonetheless find as a matter of law that the movant is not entitled to dismissal.

Assuming that the Machin residence was located on federal property within the Indiana Dunes National Lakeshore, the trial court nonetheless had jurisdiction over this prosecution. 16 U.S.C. § 460u (1970) establishes the Indiana Dunes National Lakeshores. Section 460u-8 provides:

"Nothing in sections 460u to 460u-9 of this title shall deprive the State of Indiana or any political subdivision thereof of its civil and criminal jurisdiction over persons

found, acts performed, and offenses committed within the boundaries of the Indiana Dunes National Lakeshore or of its right to tax persons, corporations, franchise, or other non-Federal property on lands included therein."

Appellant contends that the State may not rely on the federal statute on appeal, having not done so in the trial court. Section 35-3.1-1-8(b) makes prosecutorial response to the motion to dismiss optional. Moreover it is well established that a decision of the trial court will be sustained if a valid ground exists to support it, whether or not the trial court considered those grounds. *Notter* v. *Beasley*, (1960) 240 Ind. 631, 166 N.E.2d 643, 93 A.L.R.2d 905; *Ertel* v. *Radio Corporation of America*, (1976) Ind. App., 354 N.E.2d 783.

Appellant further argues that he has been deprived of an opportunity to challenge the constitutionality of the federal statute. He has not been deprived of any such opportunity, he simply failed to avail himself of any.

Appellant also argues that the State failed to "prove jurisdiction." The State proved that the acts alleged were committed at a certain place within Porter County, Indiana. Whether that place was within the territorial limits of the State for purposes of the State's power to define and prosecute crimes was a question of law, which we have decided adversely to appellant.

## II.

Appellant assigns error both to the overruling of his motion for change of venue from the county and to the manner in which the trial court conducted the hearing thereon. Appellant initially moved for a change of venue on October 25, 1974, but the trial court summarily denied the motion. Pursuant to the mandate of this Court in *State ex rel. Bruce* v. *Porter Superior Court*, (1975) No. 175 S 2, the trial court withdrew its denial and held a hearing on January 13, 1975.

At the hearing appellant introduced approximately three

dozen newspaper articles concerning various aspects of this case which appeared in two Porter County newspapers and one Lake County newspaper with considerable circulation in Porter County. These articles reported the finding of the Machins' bodies, the investigation of the case, appellant's arrest in Alabama, and various legal proceedings, including appellant's being charged with the December 7 rape. More than half of these articles appeared in February, 1974, the month of the crime. Most of the articles were small; some mentioned appellant's case along with others. All appeared to be relatively straightforward, unsensationalized, factual reports, and appellant disclaimed at the hearing any contention of inflammatory journalism.

Appellant also introduced evidence of radio news reports concerning the case by local radio stations; these also occurred mainly at the time of the finding of the bodies.

An attorney and former Valparaiso mayor testified that the case had been a subject of discussion in the community and that he was generally familiar with its facts, but he admitted that such discussion tended to ebb as time passed, and that, being active in public affairs, the witness was probably better informed than most Porter County residents. A resident of Beverly Shores testified that the residents of that community held strong feelings about the case, but Beverly Shores, the site of the crimes, constituted a very small fraction of the population of Porter County.

The trial court denied the motion, holding that the process of jury selection, voir dire examination and challenges, would suffice to protect appellant against such prejudice as existed in the community. Appellant concedes that under Ind. R. Cr. P. 12, the granting or denial of his motion was discretionary with the trial court, and contends that the court abused its discretion.

As the United States Supreme Court most recently held in *Murphy* v. *Florida*, (1975) 421 U.S. 794, 95 S.Ct. 2031, 44

L.Ed.2d 589, due process requires that criminal defendants be tried by impartial jurors, but not necessarily by jurors completely insulated from extraneous knowledge of the case. "It is sufficient if juror can lay aside his impression or opinion and render a verdict on the evidence." 421 U.S. at 800, 95 S.Ct. at 2036.

Our standard for discretionary changes of venue because of prejudicial publicity has been stated as follows:

"It is the burden of the defendant to produce evidence of community bias sufficient to convince the trial judge that he cannot obtain a fair trial in that particular county. *Dickens* v. *State*, (1973) 260 Ind. 284, 295 N.E.2d 613." *Daniels* v. *State*, (1976) 264 Ind. 490, 493, 346 N.E.2d 566, 568.

In *Daniels* and in *Jarver* v. *State*, (1976) 265 Ind. 525, 356 N.E.2d 215, we took into account the fact that considerable time had elapsed since publication of the news accounts in determining whether reasonable basis for the trial court's decision existed. Here eleven months separated the heavy publicity from the hearing, and fourteen months from trial. There was sufficient basis for the trial court's determination that sufficient bias to imperil the fairness of appellant's trial was not present.

Appellant argues that the trial court improperly relied on voir dire to deal with the danger of prejudicial publicity, citing the American Bar Association's Standards for Criminal Justice relating to *Fair Trial and Free Press*. Reliance on improper factors may constitute an abuse of discretion no less than a decision manifestly unsupported by evidence. *City of Elkhart* v. *Middleton*, (1976) 265 Ind. 514, 356 N.E.2d 207, 210-11. The comments to section 3.2 of the Standards suggest that rulings on motions for change of venue should not be made "to turn on the results of *voir dire;* rather they should constitute independent remedies designed to assure fair trial when news coverage has raised

substantial doubts about the effectiveness of the *voir dire* standing alone." *Id.* at 127 (Approved Draft, 1968). We understand the Standards to suggest that a change of venue is a remedy for community prejudice too extensive to be dealt with through the normal process of jury selection. We understand the trial court's ruling to be that no such pervasive bias existed, and that the jury selection process, which is designed to exclude those who cannot impartially serve as jurors, was sufficient to deal with such prejudice as did exist. This judgment is not unreasonable.

Appellant also claims that the trial court, in conducting the hearing, "abdicated its role of impartiality." At the beginning of the hearing the court noted that this Court had mandated the hearing. While receiving appellant's newspaper clipping exhibits, the court said:

"THE COURT: One of these doesn't have anything to do with the case.

MR. JOHNSTON: Judge, if it mentions the facts surrounding that case . . .

THE COURT: I am throwing that out, that's no good. You have got the rest of it. Here, down three-fourths of the way through and it says developments of another case. . . ."

Appellant asserts that the trial judge ripped up the article, although the record does not show this. The item in question was a four-paragraph article from the Valparaiso Vidette Messenger, September 30, 1974, which reported in passing, after discussion of an unrelated prosecution, that appellant had been ruled competent to stand trial. The article had some minimal evidentiary value and the trial court should have considered it, but the error in not doing so is insignificant in view of the volume of documentary evidence adduced. There is nothing in the record of the hearing to suggest that the trial court rejected the exhibit out of hostility to appellant, rather than from a judgment as to its lack of materiality. Even if the judge in fact ripped up the

clipping, that action does not necessarily indicate impartiality; appellant's exhibit consisted of fifteen Vidette Messenger articles, and the court needed to distinguish between those admitted and those rejected, to avoid confusion.

Finally during examination of a newspaper reporter, the trial court struck testimony that most Porter County murder cases were venued out of the county, noting a lack of any foundation for such a conclusion. In this and the clipping exchange, appellant assumes that any *sua sponte* action by the trial court constitutes "advocacy" for the party benefited thereby. He is mistaken. The trial court has discretion to guide the course of proceedings before it; it is not required to accept incompetent evidence regardless of objection.

Even without the presence of a jury to be influenced, the trial court has the duty to conduct proceedings in an impartial, decorous manner, so as not to intimidate either party in presenting matters to the court or to demean the public image of judicial integrity. *Meyers* v. *State*, (1977) 266 Ind. 513, 364 N.E.2d 760. Having reviewed the entire record of this hearing we find that the trial judge "maintained a dignified and tolerant attitude and did not engage in any improper undignified or idio-syncratic behavior which would have served to threaten the fairness of the proceedings. *Musick* v. *State*, (1976) 265 Ind. 207, 352 N.E.2d 717, 720.

### III.

Appellant next challenges both the timeliness and adequacy of the State's responses to his alibi notice.

Appellant filed his notice of intent to present alibi evidence on March 27, 1975, the eleventh day before the April 7 trial setting. The notice sought to require the prosecutor to respond with a statement of the exact place and *time* of the crime.

The prosecutor filed a response with the trial court on the same day, but the response was not served on appellant until

Wednesday, April 2, when a copy was left with the secretary at the office of appellant's attorney. At trial appellant objected to testimony of Dr. McBride, the forensic pathologist, as to the time of the victims' deaths, arguing that the alibi response was untimely. The prosecutor explained to the court that his delay in serving the response was due to the three-day Easter weekend, during which the court offices were closed, and to difficulties in conveying the response to the special judge's law office for his approval, which both the prosecutor and the special judge apparently assumed to be a proper step to take prior to service of the response on appellant. The court over-ruled the objection and allowed the State to introduce its evidence.

Appellant's notice listed the places appellant claimed to be between 3:00 a.m., February 4, 1974, and 3:00 p.m., February 5. The response of the prosecutor simply stated that the State would prove that the murders occurred on February 4, 1974.

## A.

Appellant contends that the response of the State was not timely and that the State should therefore suffer the sanction of the alibi notice statute. Indiana Code §§ 35-5-1-1- to 3 (Burns 1975) regulates the presentation of alibi evidence. Section 35-5-1-1 requires that the defendant, no less than ten days before trial, give written notice to the prosecutor of his intention to offer alibi evidence, specifying the place the defendant claims to have been. The next section permits the defendant to require the prosecutor to serve him not less than eight days before trial with a statement of the "exact date" and "exact place" of the offense. The final section provides for exclusion of evidence establishing or rebutting an alibi for failure of the defendant and the prosecutor, respectively, to comply with the statutory notice requirements, unless good cause for non-compliance is shown.

There is no question that the prosecutor's response in this case was served only five days before trial. The issue is

whether the trial court could find good cause for the failure to serve appellant timely.

Appellant first argues that the trial court could not find good cause because the prosecutor offered no evidence of the reasons for his late response, only his unsworn statement. The statute does not require any formalities in the proof of good cause. Appellant sought to establish late service by the affidavit of his attorney's secretary. The trial court could rely on the prosecutor's unsworn statement to establish good cause.

Appellant next argues that the statement of the prosecutor, accepted as true, was insufficient to establish good cause. The prosecutor did not exclude every possibility that appellant's counsel could have been timely served. But "good cause" is not synonymous with "physical impossibility." The fact that appellant filed his notice on the eleventh day before trial, immediately before the Easter holiday weekend, and that the prosecutor erroneously assumed the necessity of obtaining approval of the response from the special judge, who was a practicing attorney, are sufficient basis for a finding of good cause for the prosecutor's non-compliance with the statute.

## B.

We are left with the issue of the degree of specificity stating the time of the offense required by section 35-5-1-2. This Court has never directed itself to that issue, although in *Pearman* v. *State,* (1954) 233 Ind. 111, 117 N.E.2d 362, the statement is made that the prosecutor's response should state the "exact place and *time.*" 233 Ind. at 118, 117 N.E.2d at 366. The question of the content of the prosecutor's statement was not before the Court in that case.

We are aware that the Court of Appeals has recently held that the prosecutor is required by the statute only to state the date of the offense, other discovery devices being available to the accused for determining the time of day at which the offense occurred. *Hampton* v. *State,*

(1977) Ind. App., 359 N.E.2d 276, 278. We must respectfully disagree with that Court, although its holding is obviously well-considered, because we find that the notice of alibi procedure is a special form of discovery unlike the court-ordered discovery developed by this Court in the past several years.

The function of court-ordered discovery is to enhance the efficiency of the criminal process by permitting each party access to information in the possession of the other. Such access provides for speedy and thorough case preparation. The notice of alibi statute is not only older than the criminal discovery procedures defined by our case law, but differs from those procedures in purpose and function. The notice of alibi statute is a special pleading device which permits narrowing of certain factual issues, time and place of the offense, beyond the specificity required by the statutes governing the charging of offenses, and confines the proof to the time and place specially pleaded. Court-ordered discovery does not serve this purpose, nor function in this manner, and it is accordingly unrealistic to assume that such discovery can supplement the alibi statute in fulfilling its role, although this does not imply that defendants may not discover material related to the time and place of the offense.

We believe that the purpose of the notice of alibi statute is to narrow the factual issues of time and place to the degree practicable. Consequently we hold that section 35-5-1-2 requires the prosecutor to state the time of the offense with such reasonable specificity as the circumstances of the case allow. Hereafter, if the evidence available to the State permits, the prosecutor's statement must specify the time of day as well as the date; conversely, if the evidence does not permit exact determination of the time of the offense more exactly than a period of several days, the State is required only to respond that the offense occurred within such a period. *State* v. *Lizotte,* (Me. 1969) 249 A.2d 874.

In the present case the evidence abundantly supports the

conclusion that the State could not narrow the evidence beyond a twenty-four hour period: no witnesses saw the victims for nearly forty-eight hours, and medical testimony as to the time of death was conflicting and uncertain. Under such circumstances the prosecutor's statement of the time was as precise as reasonably possible, and was adequate to satisfy section 35-5-1-2.

## IV.

Appellant filed a pre-trial motion to suppress testimony arising from pre-trial confrontations between him and several State's witnesses. CEP identified appellant in a line-up in the Porter County Jail in March of 1974, after appellant's return from Alabama. Appellant challenged the validity of the line-up on the grounds that he was deprived of the assistance of counsel. A pre-trial hearing was commenced November 12, 1974, to consider this line-up but was continued indefinitely without ruling. Subsequently the trial judge disqualified himself and a special judge was appointed. Appellant moved the court to complete the hearing, and renewed his motion to suppress. The trial court overruled appellant's motion to suppress without concluding the hearing. During CEP's testimony appellant preserved this issue by timely objection.

Appellant also alleged in pre-trial written motion that Mr. and Mrs. Whitehouse, at whose house appellant appeared on the morning of February 4, had been subjected to an unduly suggestive photographic display by investigating police agencies. This motion was overruled without any hearing. At trial Mr. Whitehouse was unable to identify appellant as the man who came to his door; Mrs. Whitehouse so identified appellant over objection. An accused who challenges the admissibility of identification testimony on constitutional grounds is entitled to have his challenge adjudicated by the trial court, applying appropriate standards, outside the presence of the jury. *Dickson* v. *State*, (1976) 265 Ind. 325, 354 N.E.2d 157; *United States ex rel. Fisher* v.

*Driber,* (3rd Cir. 1976) 546 F.2d 18; *United States* v. *Allison,* (9th Cir. 1968) 414 F.2d 407. We attribute the trial court's error in failing to conduct hearings on these motions to the confusion engendered by the more than forty written pre-trial motions filed by appellant in the murder prosecution, some of which were cumulative and others of which sought multiple relief.

Having determined that the trial court erred we must consider the appropriate remedy. CEP identified appellant at trial but no testimony concerning her line-up identification was elicited by the State. Appellant would be entitled to suppression of her testimony identifying him if:

(1) the line-up was conducted in derogation of appellant's right to the assistance of counsel, in that: (a) the line-up occurred subsequent to the filing of charges against appellant by indictment or information in this prosecution; (b) the line-up occurred in the absence of counsel for appellant; and (c) appellant had not knowingly and voluntarily relinquished the right to have his attorney present; and

(2) the State could not show a basis for the in-court identification independent of the line-up. *United States* v. *Wade,* (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *United States* v. *Famulari,* (2d Cir. 1971) 447 F.2d 1377.

Having examined the trial record carefully, we conclude that had a hearing been held, a reasonable trier of fact could not fail to find a basis for CEP's trial identification independent of the out-of-court line-up. Appellant remained in CEP's view for one and one-half hours on the night of the rape. She spoke with him and observed him under a wide range of conditions. CEP noticed a number of appellant's features and mannerisms and recalled his clothing. The line-up took place only three months after the rape. The conclusion that an independent basis existed for CEP's identification of appellant flows inexorably from the trial evidence, and we note that a thorough exploration of CEP's

observation of appellant appears to have been made on cross-examination. Since a properly conducted hearing into the issue would not have resulted in the exclusion of the challenged evidence, the error in failing to hold a hearing must necessarily be harmless. *Stowers* v. *State*, (1977) 266 Ind. 403, 363 N.E.2d 978.

Mr. Whitehouse did not identify appellant at trial, and any improper identification techniques to which he may have been exposed would not have harmed appellant. Mrs. Whitehouse is alleged to have identified appellant in court after having been exposed to an unnecessarily suggestive photographic display before trial. Her in-court identification testimony would be inadmissible if an unnecessarily suggestive pre-trial confrontation took place and if the in-court identification is the product of "irreparable misidentification" caused by the suggestive procedure. *Carter* v. *State*, (1977) 266 Ind. 196, 361 N.E.2d 1208; *Whitt* v. *State*, (1977) 266 Ind. 211, 361 N.E.2d 913.

However, even if a properly conducted hearing would have resulted in exclusion of Mrs. Whitehouse's testimony identifying appellant as the man at her door, and we intimate no view on the likelihood of this event, her testimony was of such minimal prejudice to appellant that its admission, if erroneous, was harmless beyond a reasonable doubt. The only import of Mrs. Whitehouse's testimony was to place appellant in the neighborhood of the Machin house at 2:00 a.m. on February 4, 1974. As will subsequently be demonstrated, appellant's presence *in* the Machin house is overwhelmingly established by physical evidence: his fingerprints on the refrigerator; the finding of his abandoned pick-up truck; glass from the house on his clothing; his possession of the keys to the Machin automobile. Mrs. Whitehouse is able to place appellant near the murder scene at a specific time, but since there is no indication when the Machins were killed, her testimony adds nothing new to the inference that appellant killed

the Machins; it merely reinforces the abundance of evidence of appellant's presence at the scene of the murders.

In *Swope* v. *State*, (1975) 263 Ind. 148, 325 N.E. 2d 193, we held harmless the admission of identification testimony tainted by an improperly suggestive confrontation:

"Fulmer's identification was clearly relevant, and if the court finds that 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' then the error cannot be harmless. Chapman v. California, (1967) 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705, quoting Fahy v. Connecticut, (1963) 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171. We find, however, that the error in admitting the in-court identification into evidence was harmless in this case. Smith's identification was positive. It was corroborated by the photographic identification by the Sears manager, by the fact that a car identical to appellant's was used in the crime, by the fact that the clothing found by the policemen had been described by Smith and was appellant's 32 extra long size, and by Smith's immediate recognition of appellant at the show-up twenty-four hours after the crime. Fulmer's own testimony was limited in scope: appellant left Tops and Bottoms alone about 12:15 p.m. Fulmer's limited corrobation was so insignificant, that the admission of the in-court identification was harmless to appellant's case. *Schneble* v. *Florida*, (1972) 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340." 263 Ind. at 160-61, 325 N.E.2d at 199.

Mrs. Whitehouse's testimony stands in the same position, and its admission, if erroneous, was nonetheless harmless beyond a reasonable doubt. *Chapman* v. *California, supra.*

## V.

Prior to trial appellant filed a lengthy motion seeking numerous items of discovery from the State. The trial court granted parts of the motion, including paragraphs requiring the State to provide appellant a list of witnesses and to permit appellant to inspect tangible and photographic evidence available to the State.

Within the time limits of the court's order the prosecutor

filed a list of witnesses including "30. Unknown representative of Bureau of Motor Vehicles, Indianapolis, Indiana." At trial the State called as a witness, Richard Long, director of the vehicle registration department of the bureau. Mr. Long authenticated registration records of the Machin automobile and Bruce pick-up truck. Appellant objected to this testimony on the grounds that Long's name had not been disclosed to him. The trial court overruled his objection.

The State also called Felix Peigare, an F.B.I. fingerprint identification technician who works in Washington, D.C. Mr. Peigare had compared impressions of latent prints obtained from the Machin residence and vehicle with inkprints taken from appellant. He brought with him two enlarged photographs of these prints, which were introduced as State's Exhibits Nos. 30 and 31. Appellant objected to the admission of these photographs, because they had not been produced for his inspection. The trial court offered to continue the trial to allow appellant to obtain an expert to examine the exhibits. Appellant declined the offer, and the photographs were admitted.

Appellant argues that the prosecutor intentionally suppressed the evidence in question and thereby denied appellant a fair trial, citing *Brady* v. *Maryland,* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *Birkla* v. *State,* (1975) 263 Ind. 37, 323 N.E.2d 645. These cases do not support his contention. Due process requires that the prosecution not knowingly use false or perjured testimony, or withhold or destroy evidence tending to exculpate the accused. See *Birkla* v. *State, supra,* at 263 Ind. 42, 323 N.E.2d 648, and cases cited. It does not require pre-trial disclosure of the State's evidence to the accused. *Wardius* v. *Oregon,* (1973) 412 U.S. 470, 475, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82; *Weatherford* v. *Bursey,* (1977) 429 U.S. 545, 97 S.Ct. 837, 846, 51 L.Ed.2d 30.

This Court has, however, recognized the power of trial courts to order pre-trial discovery in order to enhance the

accuracy and efficiency of the fact-finding process. In the instant case the trial court exercised that power, and the issues presented are whether the prosecutor violated the court's order and, if so, the remedy called for.

With regard to the witness Long's name the trial court appears to have found no violation of its order, in that the listing "unknown representative of the Bureau of Motor Vehicles" sufficiently designated the witness. Where a witness is to be called as keeper of the records of an agency or organization the defendant's interest in having the name of the witness is minimal, ordinarily insufficient to overcome the State's interest in the convenience to the agency in sending any available representative.

As to the photographs the trial court determined that the preferable remedy was to continue the trial to permit appellant to obtain expert evaluation of those exhibits. A multitude of Indiana cases hold that a continuance is the appropriate remedy for failure to comply with discovery orders. *Henson* v. *State,* (1976) 265 Ind. 233, 352 N.E.2d 746; *Gregory* v. *State,* (1972) 259 Ind. 295, 286 N.E. 2d 666; *Johns* v. *State,* (1968) 251 Ind. 172, 240 N.E.2d 60; *Ross* v. *State,* (1977) Ind. App., 360 N.E.2d 1015. Appellant argues that a continuance would not have been a sufficient remedy, because the prosecutor intentionally and in bad faith withheld the photographs. We recognized in *Henson* v. *State, supra,* that the remedy of exclusion could be appropriate where the prosecution "thwarted or obstructed" discovery. 352 N.E.2d at 749. We have only appellant's assertion of prosecutorial bad faith to rely on; he refers us to nothing in the record to show such misconduct, and we find nothing there to support his assertion. Voluminous discovery was sought and ordered, and the inadvertent omission of disclosure of two photographs is understandable.

Appellant also contends that the continuance offered him was inadequate to enable him to locate a fingerprint expert,

since he was also obliged to depose an absent witness in Chicago.

Upon appellant's objection to the photographs the following exchange occurred:

"THE COURT: I'm coming to the point where I'm going to have a tendency to agree with you, but I will overrule the objection and give you the right, if you want, to take these and have them examined. These things should have been turned over to him before. It assures prejudice [sic].

MR. JOHNSTON: Well, as Your Honor knows, I don't know how I'm going to find a fingerprint expert. Your Honor has got me pretty well boxed in between now and the time to get this trial over with.

THE COURT: If it requires going into next week or something, I think you can have that. But you will have a chance to see these before. I won't let them in, if you want to take them and have them examined by an expert."

There is no indication here or elsewhere in the record that the trial court was unwilling to afford appellant a reasonable period of time for the examination of the exhibits. The trial court did not err in admitting exhibits 30 and 31 or in permitting the Bureau of Motor Vehicles official to testify.

## VI.

Under one specification of error appellant argues that the court erred in admitting into evidence tangible items seized from his wife's pick-up truck, which police found in a ditch off a public road, and fingerprint impressions obtained from appellant in custody after his arrest.

### A.

Appellant moved to suppress the fingerprint evidence by written motion filed February 3, 1975. This motion was overruled without hearing before trial. The pre-trial motion averred that the fingerprints were obtained in violation of appellant's rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution.

At trial the only objection to the introduction of evidence of fingerprints taken from appellant in custody concerned the adequacy of the chain of custody maintained for the physical impressions of those prints. In *Stowers* v. *State*, (1977) 266 Ind. 403, 363 N.E.2d 978, the Court held that errors in the overruling of pre-trial motions to suppress are not preserved for appeal unless objection is made at trial on the grounds presented in the motion. No error has been preserved concerning denial of appellant's motion to suppress evidence of his fingerprints.

On appeal appellant urges that failure to hold the suppression hearing was fundamental error because his motion was based upon constitutional grounds. However, as Judge Sullivan points out in his thoughtful analysis of fundamental error in *Winston* v. *State*, (1975) 165 Ind. App. 369, 332 N.E.2d 229, application of the doctrine does not depend upon the constitutional basis of the alleged error, and the erroneous admission of evidence without objection is not, ordinarily, the type of error to which the doctrine of fundamental error applies. "Rather, fundamental error is error which, if not rectified, would deny the appellant 'fundamental due process.'" *Malo* v. *State*, (1977) 266 Ind. 157, 361 N.E.2d 1201, 1205. We do not find the admission of the fingerprint evidence, if it was in fact erroneous, to so vitiate the trial.

### B.

Appellant also sought, by pre-trial motion, suppression of evidence of the search of his wife's pick-up truck. This motion was also overruled without a hearing; unlike the fingerprint issue, this issue was preserved by proper objection. Since it does not appear that any articles removed from the truck were introduced into evidence, we assume that appellant objects to testimony describing the search of the truck and the finding of a shotgun barrel filler inside.

Here again appellant was entitled to a hearing on his mo-

tion, which averred that an illegal search had taken place, resulting in evidence against him. This averment, if true, would entitle appellant to exclusion of the resulting evidence. *Mapp* v. *Ohio*, (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The merits of appellant's motion should have been adjudicated in an evidentiary hearing outside the presence of the jury.

Here, however, we believe that the error is harmless beyond a reasonable doubt. The circumstances surrounding the search appear in the record in sufficient detail to convince this Court that a hearing on the issue could only have resulted in a finding that no unreasonable search occurred.

Beverly Shores Town Marshall Wayne Blozis conducted the "search" of the pick-up. Blozis received the report from Mr. Whitehouse of the man who came to the Whitehouse residence claiming that he had been in an accident and that his wife was trapped in the car. Blozis set out to investigate this reported accident. At this time the Machins' bodies had not been discovered, nor was there any indication that a serious crime had been committed. Blozis found a pick-up truck off the road in the ditch, facing the wrong way. Its doors were unlocked. He examined the exterior of the truck, noticing several beer cans, then opened the door to find the truck's registration. In so doing he saw the shotgun filler lying on the seat. The registration certificate was in the name of Mrs. Alicefaye Bruce, appellant's wife.

It is apparent from this record that Officer Blozis was not investigating a crime or searching for incriminating evidence, since he was unaware that the murders had been committed. Rather he was seeking the accident reported to Mr. Whitehouse. Blozis could not know whether there was in fact a woman trapped in a wrecked vehicle, or if so, where the vehicle was. The possibility that the accident occurred as claimed presented Blozis with an emergency requiring that he find the accident or disprove its existence as quickly as possible. When he found the pick-up

in the ditch he had no reasonable alternative but to examine it to determine whether it contained a woman requiring assistance, whether it could lead him to the accident, or whether it could lead him to the man who reported the accident. Emergency circumstances involving injury or imminent danger to a person's life justify governmental intrusion for the purpose of preventing further injury or aiding those injured. *Maxey* v. *State,* (1969) 251 Ind. 645, 244 N.E.2d 650; *United States* v. *Goldenstein,* (8th Cir. 1972) 456 F.2d 1006. Blozis' entry of the truck and check of its registration are justifiable on this basis. The shotgun filler was seen by him inadvertently during the course of this justifiable intrusion as it lay in plain view; its finding was therefore not the product of an illegal search or seizure. *Coolidge* v. *New Hampshire,* (1971) 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

## VII.

Appellant urges that the trial court erred in refusing to examine the jury to discover whether the jurors had been exposed to allegedly prejudicial newspaper articles which appeared in local papers during trial. The jury was not sequestered.

The first article appeared April 8, 1975, after the selection and swearing of the jury but before the presentation of any evidence. It recited the stage which the proceedings had reached and said that trial was delayed by the hearing of pre-trial motions. The account also revealed that appellant had entered and withdrawn an insanity plea, and that court-appointed psychiatrists had found appellant competent to stand trial.

Three more small articles appeared over the April 11-12 weekend. These recounted testimony given by several witnesses, including CEP, the victim of the December 7 incident; and Dr. McBride, the State's forensic pathologist. One article revealed the pendency of charges against appellant for the armed rape of December 7.

Appellant requested that the trial court examine the jurors individually to determine whether they had seen the articles; the trial court reviewed copies of the articles and denied the request.

In *Lindsey* v. *State,* (1973) 260 Ind. 351, 358-59, 295 N.E. 2d 819, 824, we set forth a procedure for resolving the problem of potential prejudice to the accused by publicity appearing during trial.

"Upon a suggestion of improper and prejudicial publicity, the trial court should make a determination as to the likelihood of resulting prejudice, both upon the basis of the content of the publication and the likelihood of its having come to the attention of any juror. If the risk of prejudice appears substantial, as opposed to imaginary or remote only, the court should interrogate the jury collectively to determine who, if any, has been exposed."

Since the trial court did not interrogate the jurors collectively or individually, we must concern ourselves with this first portion of the *Lindsey* procedure to determine whether the failure to interrogate was reversible error. The test set out in *Lindsey* of the necessity of further inquiry is whether the likelihood of resulting prejudice is "substantial, as opposed to imaginary or remote." This likelihood is a function of two factors, the content of the publication and the likelihood of exposure of the jury to it. If either factor is absent or only minimally present, then no substantial likelihood of prejudice exists, and the trial court need not further inquire of the jurors their exposure to the publication. In making this determination on appeal we defer to the lower court's discretion. *Lindsey* v. *State, Ibid.*

*Lindsey* does not explicitly define the qualities rendering publicity prejudicial, but an examination of that case and *Liddle* v. *State,* (1973) 260 Ind. 548, 297 N.E.2d 801, reveal two categories of publicity with which we are concerned. See also *Sacks* v. *State,* (1977) Ind. App., 360 N.E.2d 21, 27-28. In *Lindsey* a newspaper article reported that the accused was an escapee from a mental institution to which he had been

committed for attacking a woman. This information was apparently factual but would not have been admissible at his trial. The account also stated that a witness had identified the defendant from police photographs, while in fact she had been unable to do so.

In *Liddle* a police officer was charged with theft from a prisoner. During his trial a newspaper report appeared containing several items of unrelated misconduct by the accused, none of which would have been admissible against the defendant at his theft trial.

The two types of prejudicial reports with which we are concerned are:

(1) inflammatory matter which would not be admissible at the defendant's trial, and

(2) mis-statements or distortions of the evidence given at trial.

Appellant analogizes the report of his insanity plea to the report of Lindsey's commitment, but the analogy is strained; the *Lindsey* account revealed that Lindsey had been institutionalized for violent, anti-social conduct, while the April 8 article merely revealed a not uncommon legal maneuver in appellant's case. In *Lindsey* the account appeared after the conclusion of the State's case-in-chief, while here it appeared prior to the presentation of any evidence, while the jurors were as yet unchallenged or tempted by evidence to make inferences and conclusions. Likewise the report that charges were pending against appellant for the assault on CEP, while containing information not given in or admissible into evidence, was far less prejudicial than the information of other crimes reported in *Lindsey* and *Liddle* because CEP had already testified as to appellant's conduct.

Appellant also contends that the April 12 articles mis-stated Dr. McBride's testimony concerning his examination of the body of Mrs. Machin. The pathologist testified that a vaginal examination of the victim revealed a large number of mature

spermatozoa and prostatic secretions; he affirmed that these findings indicated sexual intercourse. He also testified that examination of Mr. Machin's testes revealed "minimal spermatogenesis with only an occasional mature sperm form found." On cross-examination he admitted that he could not exclude the possibility that the intercourse occurred after death. The April 12 articles both reported that Dr. McBride said that Mrs. Machin "had sexual relations with someone near the time of her death . . . probably not with her husband" (Vidette-Messenger) and that "someone had sexual intercourse with Mrs. Machin, 72, either at the time of death or later." (Post-Tribune). The articles did not mis-state or distort the pathologist's testimony; at most they drew obvious inferences therefrom.

Finally appellant complains that in describing CEP's testimony, the April 12 Post-Tribune article used the word "rape," which the court had stricken from CEP's testimony. This too was minimally prejudicial. It is obvious from CEP's testimony that appellant forced her to submit to intercourse.

The trial court could properly have found that the content of the articles was not such as to give rise to a substantial likelihood of prejudice, regardless of jury exposure to them. Therefore the court did not err in refusing to examine the jurors concerning the articles.

## VIII.

Appellant contends that, on several occasions during trial, the special judge "abdicated his role of impartiality" and "became an advocate," for the State, by his conduct during the examination of witnesses. Five instances are complained of:

(1) During examination of Sergeant Jasicki, one of the first police officers at the Machin house, the court inquired why Jasicki had gone to the house (to check on the Machins' apparently abandoned Cougar).

(2) During examination of the son of the decedents, the

court asked what Mr. Machin's occupation had been (stationary railroad engineer).

(3) During examination of Robert Rubin, who sold Mrs. Bruce the shotgun, the court asked several questions about the shotgun's characteristics, and elicited that the gun would fire high brass-based cartridges.

(4) During examination of Agent Ivan concerning the box of shotgun shells received from Mrs. Bruce, the court asked Ivan to explain several terms used in describing the shells ("twelve gauge," "no. 6 duck and pheasant load").

(5) During the cross-examination of Dr. McBride, the State's forensic pathologist, appellant's counsel attempted to elicit the time when the sexual activity evinced by tests on Mrs. Machin's body took place. The witness indicated some uncertainty, and said "I don't think that it was more than twenty-four to thirty-six hours." Appellant's attorney restated the answer to suggest that Dr. McBride was certain that the time involved was twenty-four hours. The court interjected, "Mr. Johnston, that's not what he said." When court recessed for lunch after this exchange, the jury was admonished by the judge not to infer that the court expressed any opinion on the evidence.

This Court considered the propriety of interrogation of witnesses by the trial court in *Kennedy v. State,* (1972) 258 Ind. 211, 226, 280 N.E.2d 611, 620-21:

> "It is true that a trial judge may in any case, within reasonable limits, interrogate a witness. However, this should never be done in a manner which would improperly influence the jury. Dombkowski v. State (1967), 249 Ind. 32, 230 N.E.2d 602; Rhodes v. State (1930), 202 Ind. 159, 172 N.E. 176. The purpose of the judge's discretionary power to examine witnesses is to be an aid to the jury in its fact finding duties, however this must be done in an impartial manner so that the judge does not improperly influence the jury with his own contentions. Thomas v. State (1967), 248 Ind. 447, 229 N.E.2d 722; Dombkowski v. State, *supra.* Care should be exercised to avoid indirect expression of opinion by the trial judge,

and it is improper for the trial judge to ask questions which are reasonably calculated to impeach or discredit the witness or his testimony. Canon 8 of the Code of Judicial Conduct and Ethics reads in part:

'A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.'

A jury of laymen will often have an awesome respect for the institution of the American trial judge. This can lead them to accord great and perhaps decisive significance to the judge's every word and intimation. It is therefore essential that the judge refrain from any actions indicating any position other than strict impartiality.

Although most likely inadvertent, the trial judge in the case at bar appears to have abandoned his position of impartiality and neutrality, which, especially in light of the closeness of the insanity issue, was extremely detrimental to appellant's cause. This being so, the necessity for a new trial is manifest."

In *Kennedy* the trial judge so extensively and critically interrogated two witnesses who sought to give evidence favorable to the accused that this Court found that he had lost the appearance of impartiality and indicated doubt in the witnesses' credibility. In view of the deference likely to be accorded the judge's opinions by the jurors, any judicial intervention into the trial which bears the appearance of advocacy of one party's view must be avoided. But the questions asked by the trial court in this case in no sense indicated any personal belief or partiality.

Appellant's argument seems to assume that any interrogation by the court which discloses facts favorable to the State constitutes advocacy by the court. If this were true it would be difficult for the trial court to intervene in witness examination for proper purposes, "to aid the jury in its fact finding duties" and "to promote expedition, and prevent unnecessary

waste of time, or to clear some obscurity," *Kennedy* v. *State, supra.* In *Musick* v. *State,* (1976) 265 Ind. 207, 352 N.E.2d 717, the appellant complained that the trial court aided the prosecutor by demonstrating to him the proper manner of questioning a witness. We rejected this claim noting that the trial court's "technical assistance" to the prosecutor "was within his discretion to guide the trial to preserve its fairness and integrity." 352 N.E.2d at 719-20.

As to the trial court's intervention in appellant's cross-examination of Dr. McBride, that interruption occurred in the following circumstances:

> "MR. JOHNSTON: Now, you mentioned twenty-four hours?
>
> A. Said give or take. In other words, it could be twelve hours, twenty-four hours, thirty-six hours. The point of it is I can only go from zero out so far. . . . It's very difficult to time this thing. I don't think that it was more than twenty-four to thirty-six hours. I don't know that it wasn't less.
>
> Q. You are saying that based upon all reasonable medical certainty that it's around twenty-four hours old?
> THE COURT: Mr. Johnson, that's not what he said.
> THE WITNESS: I am saying that I don't believe that it was more than twenty-four to thirty-six hours old."

It appears from this record that the court acted to correct a misstatement of the doctor's testimony by appellant's counsel. The court does not engage in improper advocacy by stopping improper cross-examination on its own motion. *United States* v. *Wright,* (7th Cir. 1976) 542 F.2d 975. It likewise appears that the adversarial nature of the trial was not seriously diminished by the other questions. They fell within the scope of the judge's authority to clear obscurity and expedite the trial.

## IX.

At the conclusion of the testimony of Beverly Shores Town Marshall Williams on direct examination, as the court recessed for lunch on the first day of trial, appellant's counsel informed

the court that an elderly lady in the audience had "apparently become ill and had to be carried out" (On appeal he uses the word "faint"; we will use this term for conciseness). Appellant moved for a mistrial, which was denied. He requested no other relief.

On appeal he contends that the spectator fainted during "gruesome testimony" that the jury could infer that the spectator was a relative of the Machins, and that the "peril created was substantial and possibly incurable." We note preliminarily that Officer Williams' testimony was that he arrived at the Machin house before discovery of the bodies, remained outside, and looking through a window, saw what could have been a body with hands and feet bound. In a case involving murder by shotgun wounds to the heads of the victims, this was relatively innocuous testimony. Appellant's assertions of prejudice are unsubstantiated and speculative. As Justice Prentice said in *Lindsey* v. *State, supra*:

"Nor do we intend to intimate that trial judges need be intimidated by mere speculation urged by trial counsel seeking delay or tactical advantage by reason of [influences] unlikely to contaminate." 260 Ind. at 357, 295 N.E.2d at 823.

The trial court did not err in failing to inquire into possible prejudice.

## X.

During the State's examination of Dr. McBride, a juror informed the court:

"I have a problem here. I think the jury does, in that the— we hear discussion going on here in the audience and it's disturbing at least to us here. I would appreciate it if you would caution them not to discuss the case."

In response, the court admonished the audience:

"Members of the audience, the accoustics in this room are very bad and I instruct you not to discuss anything in the future."

Appellant requested that the court examine the jurors to determine if any jurors had "overheard any improper references." The court denied this request, as well as appellant's motion for a mistrial. Appellant contends that the court was required to follow the procedure of *Lindsey* v. *State, supra,* (see preceding section) :

> "If the risk of prejudice appears substantial, as opposed to imaginary or remote only, the court should interrogate the jury collectively to determine who, if any, has been exposed. If there has been no exposure, the court should instruct upon the hazards of such exposure and the necessity for avoiding exposure to out-of-court comment concerning the case. If any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof. After each juror is so interrogated, he should be individually admonished. After all exposed jurors have been interrogated and admonished, the jury should be assembled and collectively admonished, as in the case of a finding of 'no exposure.' If the imperiled party deems such action insufficient to remove the peril, he should move for a mistrial." 260 Ind. at 358-59, 295 N.E.2d at 824.

The State initially expresses doubt that *Lindsey* applies to the area of juror contact with audience discussion. In *Daniels* v. *State,* (1976) 264 Ind. 490, 346 N.E.2d 566, 568-69, this Court applied *Lindsey* to a case in which a juror's wife was threatened by the victim's mother. In *Weatherford* v. *State,* (1975) 164 Ind. App. 340, 328 N.E.2d 756, 759-60, the Court of Appeals adopted the *Lindsey* procedure in circumstances involving anonymous phone calls directed to jurors. While the facts of this case do not necessarily involve such serious interference with the jury, the *Lindsey* principles are well suited for treating varying levels of prejudicial influences, and we conclude that they are appropriate for application to this case.

The State next maintains that the juror's remark indicated only that the "general noise in the courtroom, which was . . . making it difficult to hear." This is obviously the trial court's understanding, as reflected in its admonition to the spectators.

But this interpretation is difficult to reconcile with the juror's request that the court "caution them not to *discuss the case*". (Emphasis added.)

Since the trial court did not examine the jurors as to improper remarks heard, we are again concerned, as in the preceding section, with the threshhold determination of whether a substantial likelihood of prejudice existed, such as requires the trial court to make further inquiry into the matter. *Lindsey* v. *State, supra.* Unlike the situations presented in *Lindsey, Daniels,* and *Weatherford,* we do not have available to us the content of the discussion referred to by the juror. But audience discussion in general is a less prejudicial extraneous influence than newspaper accounts, threats, or anonymous phone calls. The spectators have heard the same evidence as the jury, and the jurors, instructed as to their role as trier of fact, have no reason to defer to audience opinion. In exercising its discretion in determining the necessity of further inquiry, the trial court may consider the danger of aggravating prejudice by emphasis, and of hindering the jury's assimilation of the evidence by requent interruption. In view of these considerations a reasonable basis exists to support the lower court's refusal to examine the jurors. "It is unrealistic and impossible to expect or require that a jury be a laboratory completely sterilized and freed from all external factors." *Lindsey* v. *State,* 260 Ind. at 357, 295 N.E.2d at 823 (quoting Sharp, J.).

## XI.

After the jury had retired the special judge and defense counsel met in a hallway. A bailiff joined them and explained that she had just been in the jury room making coffee for the jurors. Appellant's attorney did not request the court to take any action regarding the incident. On appeal appellant argues that the trial court was required, *sua sponte,* to inquire into possible prejudice resulting from the bailiff's presence, and that absent such inquiry, "harm will be presumed."

Indiana Code § 35-1-37-4 (Burns 1975) regulates the conduct of the bailiff toward jurors during deliberation. The statute provides in relevant part:

"They may retire under the charge of an officer, who must be sworn by the clerk to keep them together in some private and convenient place, and furnish them food as directed by the court, and not permit any person to speak or communicate with them, nor do so himself unless by order of the court, or to ask them whether they have agreed upon their verdict. . . ."

We will assume that the bailiff's coffee-making was not an act of furnishing the jury with food as directed by the court, since neither party addresses this possibility. Appellant argues that the bailiff's foray into the jury room violated the statute and thus constituted an "irregularity" which imposed a duty on the trial court to investigate and determine affirmatively that no prejudice to appellant resulted.

"When an irregularity such as this occurs harm will be presumed, and if the irregularity is not explained, a reversal of the judgment should follow." *Gann* v. *State*, (1975) 263 Ind. 297, 301-302, 330 N.E.2d 88, 92; *Frasier* v. *State*, (1974) 262 Ind. 59, 68, 312 N.E.2d 77, 81; *Conrad* v. *Tomlinson*, (1972) 258 Ind. 115, 123, 279 N.E.2d 546, 551.

The flaw in appellant's argument is that this case does not present "such an irregularity" as did the cases cited. Only communications relating to the substantive rights of the accused give rise to presumptions of harm; such communications usually involve ex parte delivery of legal opinions or instructions to the jury. *Wallace* v. *State*, (1977) 266 Ind. 344, 363 N.E.2d 956; *Turner* v. *State*, (1970) 254 Ind. 91, 257 N.E.2d 825; *Deming* v. *State*, (1956) 235 Ind. 282, 133 N.E.2d 51. In this case appellant has not shown any "communication" between bailiff and jury: he has merely shown the presence of the bailiff in the jury room. No conversation between jury and bailiff was shown, nor was it established that the jurors were actually deliberating at the time. Under such circumstances no presumption of prejudice

arises, and the trial court is under no duty to inquire on his own motion into the possibilities of prejudice from such an incident. *Wallace* v. *State, supra; Deming* v. *State, supra.*

## XII.

Appellant moved to suppress a shotgun found in the garage of his Michigan City residence by police and F.B.I. agents. The trial court overruled the motion following an evidentiary hearing. It is undisputed that the discovery and seizure were not authorized by warrant. The State carries the burden of proving that a warrantless search or seizure fell within an exception to the warrant requirement. *Candler* v. *State,* (1977) 266 Ind. 440, 363 N.E.2d 1233, 1240, and cases cited. In reviewing the trial court's ruling, we do not reweigh the evidence but look to the evidence most favorable to the ruling and any uncontradicted adverse evidence. *Whitt* v. *State,* (1977) 266 Ind. 211, 361 N.E.2d 913.

Evidence received at the hearing indicated that on the morning of February 6, the day after the bodies were found, representatives of the F.B.I. and the various State and local law enforcement agencies investigating the murders met to compare information and identify suspects. F.B.I. Agent Allison attended this meeting and at the time, knew from his personal examination of the bodies and the crime scene that the Machins had been killed by shotgun blasts. He had personally found two spent shotgun shell casings at the scene. Appellant was mentioned as a suspect. It is not clear how much evidence pointing to him had come to light at this point, but one investigator testified that the consensus was that probable cause for appellant's arrest was not yet available.

Six agents and officers went to the Michigan City home of appellant, his wife, his six-year old son, and his mother-in-law. They intended to talk to appellant, and "to search for any evidence that [might] be of importance." The officers did not know whether appellant was at his home. On arriving they

divided into two groups of three men each. One group went to the front door and knocked; the other came up the alley to the rear of the house and "covered" it from concealed positions. Their testimony was that this was a standard practice intended to prevent escape and for their protection.

After some minutes F.B.I. Agent Allison noticed that the Bruce garage was so positioned that a person within could ambush the officers or slip away unseen. Standing in the public alley and looking through an open garage door, Allison saw the stock of a shotgun or rifle sitting on a shelf. He could not, from outside the garage, view the entire interior or be certain that no one was within.

He had not previously known that the shotgun would be on the shelf. From outside the garage he could not determine that the weapon was the same sort used to kill the Machins. Because of the possibility that someone might be in the garage, Allison entered to "secure" the shotgun. He found it to be an Ithaca twelve gauge pump-action shotgun, loaded with two live shells, and with its safety off. He took the shotgun, after unloading it. The shells were found to be of the same manufacture, gauge, and load as the spent casings found at the murder scene. Later tests showed that at least one of those casings had been fired in the Ithaca. A gun dealer testified that he sold the shotgun to Mrs. Bruce; appellant's fingerprints were found on the gun.

The process by which the shotgun came into police possession involves three separate intrusions into constitutionally protected areas of privacy, each of which can be characterized as a "search or seizure" and requires justification.

The first intrusion occurred when Agent Allison looked into appellant's garage and saw the stock of the shotgun. Allison obtained this view standing in a public alley by looking through an open door. This action did not constitute a search, because Allison simply saw what any member of the public passing through the alley could have seen. *Montague* v. *State*, (1977) 266 Ind. 51, 360 N.E.2d

181; *MacGregor* v. *State,* (1967) 249 Ind. 195, 231 N.E.2d 241; *United States* v. *Hanahan,* (7th Cir. 1971) 442 F.2d 649.

Agent Allison's entry into the garage and close examination of the shotgun did constitute a search, however. There is no question that Allison lacked probable cause to believe that the stock he saw belonged to the weapon used in the Machin murders. Allison could not discern the gauge of the gun from outside the garage; it is not even clear that he recognized it as a shotgun rather than a rifle. To justify seizure of an item in plain view, the contraband or evidentiary nature of the item must be evident upon the "plain view." *Candler* v. *State,* (1977) 266 Ind. 440, 363 N.E.2d 1233, 1240.

Agent Allison's asserted reason for entering the garage was to protect his own and the other agents' safety. The garage was so situated that a person inside might be able to ambush the officers; Allison could see some sort of weapon but could not view the whole of the garage's interior. Although the agents and officers disclaimed having probable cause to arrest appellant, they possessed sufficient information, specifically the discovery of the Bruce pick-up in Beverly Shores and of the Machin Cougar near the Bruce residence, upon which to base reasonable suspicion that appellant might be the killer. Thus the officers had some reason to believe that the man to whose home they had come was a dangerous and possibly desperate killer. The entry of the open garage and inspection of the gun can reasonably be described as a "limited intrusion" since it involved no more than entry into an open garage to examine more closely a gun lying on an open shelf.

The question therefore is whether law enforcement officials may make a limited entry into the building of a suspect whom they do not have probable cause to arrest, to secure a plainly visible weapon for their own protection, when they entertain a reasonable suspicion based on articulable facts that the suspect is a dangerous criminal. It is clear that the Constitution permits some intrusion into the

personal privacy guaranteed by the Fourth Amendment upon less than probable cause. In *Terry* v. *Ohio,* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the United States Supreme Court held:

> "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27, 88 S.Ct. at 1883.

The "reasonable search for weapons" considered in *Terry* was the patting down of outer clothing commonly referred to as a "frisk." In reviewing the reasonableness of the decision to perform such a search the Court said:

> "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Ibid.*

> "[A] perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody. . . ." 392 U.S. at 26, 88 S.Ct. at 1882-83.

The difference between the circumstances which we consider here and the *Terry* line of "stop and frisk" cases is that Allison, rather than being faced with a man who might be armed and dangerous, was faced with a weapon lying where a man who might be a dangerous killer might be hiding. These circumstances could not give rise to probable cause to conduct a search, but they were sufficient, in *Terry's* words, to " 'warrant a man of reasonable cause in the belief' that the action taken was appropriate." 392 U.S. at 22, 88 S.Ct. at 1880. C.f. *United States* v. *Chapman,* (6th Cir. 1977) 549 F.2d 1075, 1078-79.

Appellant argues that the asserted need for self-protection was a pretext under which the officers conducted a deliberate search for evidence of his guilt. This argument is based on admissions by two of the F.B.I. agents at the suppression

hearing that one of the purposes of their visit of the Bruce residence was to gather evidence. These statements, however, are merely vague characterizations of the purpose of the visit and do not betray an intention to conduct a search; they could as well refer to the obtaining of evidence by consent of the occupants of the residence. Nothing in the manner in which Allison treated the shotgun, checking its safety and unloading it, belies his asserted concern with the potential danger of the weapon as opposed to its potential evidentiary value. Based on the consistent and not incredible testimony of Agent Allison that his entry into the garage was motivated by concern for the safety of himself and his companions, the trial court could have found that Allison's entry of the building was not motivated by the desire to obtain evidence.

Finally appellant argues that even if the officers legitimately obtained the shotgun for examination and had probable cause to seize it, no exigent circumstances were present to justify them in doing so without a warrant. This argument is not apposite to this case; evidence inadvertently discovered in the course of a lawful intrusion into an area protected by the Fourth Amendment may be seized without a warrant. *Coolidge* v. *New Hampshire,* (1971) 403 U.S. 443, 467-68, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564.

The trial court did not err in overruling the motion to suppress the shotgun.

## XIII.

Relying upon the Fourth and Fourteenth Amendments to the United States Constitution, appellant next contends that the trial court erred in denying his motion to suppress five of the State's exhibits including a box of shotgun shells, a set of car keys and items of men's clothing, which he claims were taken by police from his residence in an unlawful search. The circumstances under which the items were acquired by the police are these. While, as described in the foregoing section of this opinion, the three officers stationed themselves near the garage to the house, three other officers, without the

sanction of a warrant, knocked on the front door; Alicefaye Bruce, appellant's wife, answered. They asked to come in and were admitted by her. The officers explained that they were looking for appellant and were ushered quickly into a bedroom adjoining the front entry hall because Mrs. Bruce did not want her children to overhear their conversation. Upon learning that he was not at home they told Mrs. Bruce that they were interested in the clothes appellant had worn on February 3 and 4. They read her a rights warning form dealing with her right to refuse to permit the officers to conduct a search. She signed a consent to search form. She then, in order to facilitate the search of the house, went to get the clothing, keys and shells and gave them to the police.

Appellant first argues that inasmuch as the police suspected his guilt when they went to his home, they were obliged to try to obtain a search warrant. Failing to do so, they should not be permitted to seek the consent of the person occupying the home to search. This contention is not supported by relevant authority. The same argument was recently rejected by the Seventh Circuit Court of Appeals in *United States* v. *Cook,* (7th Cir. 1976) 530 F.2d 145, 149, *cert. denied,* 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976):

> "[Defendant's] alternative argument for suppressing the evidence obtained in the search, that the government made no showing as to why a warrant was not obtained, must also fall. The law does not require such an attempt, since a valid consent to search is characterized as a waiver of Fourth Amendment protections including the need to obtain a warrant." (Citations omitted.)

Appellant contends that his wife did not give valid consent to the search. Consent to search validates a search when it is freely and voluntarily given. The determination of the voluntariness of an alleged consent to search is determined from the totality of circumstances surrounding its giving. *Schneckloth* v. *Bustamonte,* (1973) 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. In this State the

prosecution bears the burden of showing the voluntary character of a consent to search. *Sayne* v. *State*, (1972) 258 Ind. 97, 279 N.E.2d 196. Upon review of a trial court determination of the validity of a search the appellate tribunal considers the evidence favorable to the trial court's ruling and any uncontradicted contrary evidence, and uphold the ruling if it is supported by evidence.

The testimony of the police officers clearly supports a finding of voluntariness. They knocked at Mrs. Bruce's door in the middle of the day and were invited in by her. Agent Ivan informed her of the purpose of their visit and read a "consent to search" form. Mrs. Bruce signed the form and after being advised that she could refuse permission to search, and indicating that she understood her right to refuse, went into the bedroom she shared with appellant and brought the clothing, shells and keys. Mrs. Bruce appeared calm and cooperative, and the officers did not use force or threaten her. They did not employ fraud or trickery. All of the conversation was in normal tones; no voices were raised.

Mrs. Bruce's testimony largely agreed with the officers', although she testified that she was preoccupied with the illness of her young son, and did not pay full attention to the written and oral rights advisements. Appellant also argues that Mrs. Bruce was led to believe that the officers would search the house absent her permission, but this contention is not supported by the record. The trial court could reasonably have found Mrs. Bruce's consent to search to be voluntary. The evidence shows without conflict that Mrs. Bruce was informed that she need not allow the officers to search but that she nonetheless agreed to give them the items of evidence requested. There is no indication that she passively acquiesced to an assertion of police authority; on the contrary, her active cooperation was necessary to accomplish the search.

Appellant submits that the consent was invalid as the product of the illegal search of the garage and seizure of appel-

lant's shotgun. Mrs. Bruce testified that it was brought into the house by a police officer. As previously determined, the police entry into the garage and the seizure of the weapon were not unlawful by Fourth Amendment standards and therefore could not have the disqualifying effect upon Mrs. Bruce's consent as a legal matter. There is likewise no inference to be drawn from the evidence that Mrs. Bruce ceased any resistance to the request of the officers to search the house upon seeing the gun. And when considered as one factor among many within the totality of the circumstances surrounding the consent, the production of the gun does not alter our determination that the evidence warranted the finding of voluntariness.

Appellant then argues that his wife acted as an "instrument of the police" when she produced the items of evidence. Upon such assertion we are asked to conclude the items so produced should be deemed inadmissible. The United States Supreme Court rejected this claim in similar circumstances in *Coolidge* v. *New Hampshire, supra.* See *United States* v. *Sherwin,* (9th Cir. 1976) 539 F.2d 1, 7-8. Here, Mrs. Bruce's decision to permit the police to search the house occurred prior to the time she chose to go and get the items for the police. Under these circumstances, her retrieval of the items was separate and distinct from her decision to permit the search in the first place, and she thereby merely facilitated that which was already constitutionally permissible at the hands of the police.

Appellant also contends that the State failed to prove that Mrs. Bruce had authority to consent to the search. Appellant cites *Dalton* v. *State,* (1952) 230 Ind. 626, 105 N.E.2d 509, 31 A.L.R.2d 1071. In *Dalton* the defendant's wife gave her consent to police to examine an automobile owned by her but used exclusively by her husband, resulting in the discovery of evidence that defendant was a hit-and-run driver. This Court held that absent express authorization by her husband, the wife could not "waive" his right to be secure from unreason-

able searches and seizures. *Dalton* was subsequently distinguished by this Court in *Lindsey* v. *State,* (1965) 246 Ind. 431, 204 N.E.2d 357, where defendant's sister, who owned the trailer in which defendant lived, was held to possess authority to permit the police entry into the trailer, where they found contraband goods in plain view.

*Dalton* probably reached the proper result but its analysis is no longer employed by the courts in determining the authority of third persons to consent to searches. Berner, *Search and Seizure: Status and Methodology,* 8 Val. L.Rev. 471, 548 (1974). The present view is that "the consent of one who possesses common authority over premises is valid as against the absent, non-consenting person with whom that authority is shared." *United States* v. *Matlock,* (1974) 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242; *United States* v. *Gulma,* (9th Cir. 1977) 563 F.2d 386; *United States* v. *Heisman,* (8th Cir. 1974) 503 F.2d 1284; *State* v. *Gavin,* (1977) 51 Ohio App.2d 49, 365 N.E.2d 1263; Berner, *supra.* "Common authority" depends on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States* v. *Matlock, supra,* at 415 U.S. 171, n. 7, 94 S.Ct. 993. See also *Frazier* v. *Cupp,* (1969) 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; *Coolidge* v. *New Hampshire, supra; United States* v. *Cook, supra.*

The premises from which the evidence was obtained in this case was a bedroom occupied by appellant and Mrs. Bruce. The clothing and shells were removed from a dresser and a closet. The keys were removed from appellant's jewelry box. Appellant notes testimony that these places were used exclusively by himself; however, we believe that the trial court was amply justified in finding that Mrs. Bruce "generally had joint access" to all areas within her own bedroom, including

appellant's jewelry box. Appellant's assertion resembles that of the petitioner in *Frazier* v. *Cupp, supra,* that his cousin, who consented to a search of their shared duffel bag, had permission to use only one compartment therein, 394 U.S. at 740, 89 S.Ct. at 1425; and his argument fares no better than Frazier's. See *United States* v. *Richardson,* (7th Cir. 1977) 562 F.2d 476.

The court below did not err in admitting the items given by Mrs. Bruce to the police at her home.

## XIV.

Appellant challenges the admissibility of numerous items of evidence for want of establishment of a chain of custody.

### A.

During testimony by the forensic pathologist that his examination of Mrs. Machin's body produced indications of recent sexual intercourse, appellant objected on the grounds that the State had failed to prove custody of the body between its discovery by police and the autopsy and pathological tests such as would preclude the possibility of "tampering." Lest we fail to grasp his meaning appellant proceeds to explain that the intercourse could have taken place *after* the police found the body. This contention strains the limits of zealous advocacy. We find the possibility that anyone would "tamper" in the manner suggested with the body of a seventy-one year old woman, dead for some hours, with what appellant's own statement of the facts characterizes as a "massive shotgun wound to the head", to be too remote and speculative to require evidence of custody of the body to preclude it.

### B.

The clothing, car keys, and shotgun shells obtained from Mrs. Bruce were admitted into evidence. An F.B.I. expert on the identification of inorganic substances testified that he had

examined the clothing and found small particles of glass which matched glass found in the broken window in the kitchen door of the Machin house and on the kitchen floor.

Appellant argues that the chain of custody established for the clothing was inadequate because at trial the packaging protecting the clothes was found to bear holes one or two inches in diameter, and pellets appearing to be mouse excrement were found on the clothing. The exhibits were therefore not in their "original condition."

This argument ignores the nature of the interests to be protected by the chain of custody rule. The purpose of the rule is to prevent "tampering, loss, or mistake with respect to an exhibit." *Graham* v. *State,* (1970) 253 Ind. 525, 531, 255 N.E.2d 652, 655. The dangers posed by tampering, loss or mistake are that (1) similar or fungible items will be confused or commingled, and (2) exhibits will be altered in some manner relevant to and destructive of their evidentiary purpose and value. Where an alteration in condition has taken place which is not relevant to the evidentiary use of an exhibit, the chain of custody rule does not require its exclusion. The presence of mouse droppings in the exhibit containers in no way vitiated the evidentiary value of the exhibits, which was the fact that glass from the Machin house was found on clothing found in appellant's room.

Appellant also argues that an insufficient foundation connecting him with the clothing was established. Agent Ivan testified as to the clothing, keys, and shells thus:

"A. This is a man's jacket, brown in color, found at the residence of Sandy Paul Bruce and given by Mrs. Bruce.

&ast; &ast; &ast;

A. These appear to be men's slacks given to me by Mrs. Bruce on the same day.

&ast; &ast; &ast;

A. This sweater was given to me by Mrs. Bruce on that same date."

The remaining exhibits were identified similarly. The witness had already established the time and place of this transaction, the Bruce residence on February 6, 1974. In context his testimony establishes that the witness obtained Exhibits 7 through 12 from Mrs. Bruce at appellant's residence. The testimony discussed in Part 12 of this opinion, to the effect that Mrs. Bruce produced the clothing in response to the witness' request for clothing worn by appellant, was admitted only for purposes of ruling on appellant's suppression motion, was not available to the jury, and is not relied upon here.

Appellant contends that the absence of evidence of direct connection of these exhibits with himself, evidence that he owned or possessed them, requires their exclusion as irrelevant. This contention has been rejected by this Court on numerous occasions. *Candler* v. *State,* (1977) 266 Ind. 440, 363 N.E.2d 1233, 1242; *Musick* v. *State,* (1976) 265 Ind. 207, 352 N.E.2d 717, 718-19; *Swininger* v. *State,* (1976) 265 Ind. 136, 352 N.E.2d 473, 476.

> "[T]he most acceptable test of relevance is the question, does the evidence offered render the desired inference *more probable than it would be without the evidence?* McCORMICK, Evidence § 185 at 437. In Indiana 'evidence tending to prove a material fact is admissible, even though its tendency in that direction may be exceedingly slight.' *Thomas* v. *State,* (1968) 251 Ind. 76, 80, 238 N.E.2d 20, [22]." *Pirtle* v. *State,* (1975) 263 Ind. 16, 34, 323 N.E.2d 634, 643, quoted in *Musick* v. *State, supra,* at 352 N.E.2d 719.

The fact that men's clothing was found at appellant's home bearing glass matching that from a broken window in the Machin house had a tendency to prove appellant's presence at the murder scene. This tendency was more than "slight." There was no error in the admission of these exhibits.

## C.

During the investigation surrounding the discovery of the bodies, Agent Allison found a spent shotgun shell casing near

each body. Both were Winchester-Western twelve-gauge cartridges, No. 6 duck and pheasant load, with red plastic tops and high brass bases. Agent Allison apparently did not keep these shells separate, but submitted them together to the F.B.I. firearms identification laboratory in Washington. There a firearms identification expert compared the shells with test shells fired from appellant's shotgun. He determined that one of the shells recovered from the murder scene was definitely fired from appellant's shotgun; the other could have been, but there were not sufficient microscopic impressions on its base to allow a positive identification. Since the two casings had been commingled, it was impossible to determine at trial whether the casing positively linked to appellant's gun had been found near Mr. or Mrs. Machin's body.

Appellant's chain of custody challenge to the shell casings is based on this failure to segregate the two casings, which he contends destroys their evidentiary value. Appellant assumes that the State proved that only one of the casings was fired from his shotgun, and that therefore the State commingled evidence of his guilt with evidence of his innocence. Unquestionably, one of the shells bore greater evidentiary weight than the other, by virtue of the expert testimony. However, the jury could reasonably have found that both shells were fired from the same gun, since the shells were similar in gauge, load and manufacture to each other, to the loaded shells in appellant's shotgun when seized, and to the shells given the police by Mrs. Bruce from appellant's closet. Which shell was found by which body seems an immaterial question; therefore the commingling of the shells did not affect their admissibility.

### D.

At the initial investigation at the Machin house broken glass from window panes in the house's rear and kitchen doors was gathered for testing. State's Exhibit 8 consisted of glass fragments tested by the F.B.I. lab and found to be different

from that found in the clothing obtained at appellant's home from Mrs. Bruce. F.B.I. Agent Ivan, who supervised the investigation, testified that he received Exhibit 8, a paper bag containing glass particles, from Agent Kasper. The propriety of the chain of custody from Ivan's receipt of the exhibit is not disputed. However, while Kasper testified that he gathered broken glass, put it in a bag and gave it to Ivan, and while he identified that bag in court, the record does not indicate what exhibit he identified. Two other collections of broken glass were identified as Exhibits 13 and 14. Exhibit 14 contained glass matched with that found in appellant's clothing.

We find from Ivan's testimony that he gathered the glass in Exhibits 13 and 14 himself. State Police Sergeant Stefankiewicz, who brought all of the exhibits to court, referred to Exhibits 13 and 14 as "envelopes" but Exhibit 8 as an "envelope or sack." Agent Kasper testified regarding a "paper sack," and Ivan, referring to the exhibit received from Kasper, characterized it as a "brown paper bag." These references in the record make clear that Kasper identified Exhibit 8 as sack of glass he gathered and gave to Ivan. This establishes each link from the discovery of the evidence to its reception by Ivan, and the subsequent chain of custody is not questioned. There was no error in admitting Exhibit 8.

### E.

State's Exhibit 18 consisted of the tape impression of a latent fingerprint obtained by an F.B.I. agent from the Machins' refrigerator. Although the murders were discovered on the evening of February 5, 1974, the fingerprint impression was not made until the morning of the next day. There is no evidence that the Machin residence was guarded or otherwise secured during the intervening night. Appellant argues that the State must show a chain of custody of the refrigerator in order to admit the fingerprint impression taken from it. We find no merit to this argument.

The admissibility of fingerprint evidence is based on the assumption, universally accepted, that the pattern of each individual's fingerprint can be produced only by contact of that individual's finger with another object. 2 J. WIGMORE, Evidence § 414 at 389 (3d ed. 1940) ; Anno. 28 A.L.R.2d 1115, 1130 (1951) ; *Medias* v. *City of Indianapolis,* (1939) 216 Ind. 155, 167, 23 N.E.2d 590, 595, 125 A.L.R. 590 (dictum). This being so there is no danger of "tampering, loss, or substitution"; the presence of appellant's latent fingerprint on the refrigerator indicates that appellant touched the refrigeraor. The only effect of the failure to guard the house between the initial police entry and the recovery of the print is to leave open the possibility that appellant entered the Machin kitchen on the night of February 5 after the murders were discovered. The jury was competent to assess the effect of that possibility or the weight to be given Exhibit 18. See *United States* v. *Scarpellino,* (8th Cir. 1970) 431 F.2d 475, 478.

### F.

The Machins' 1973 Mercury Cougar automobile was found in Michigan City on February 4. The Michigan City police took the car to their garage, initially believing it abandoned. Sergeant Carmin of the state police took the car keys which appellant's wife gave Agent Ivan, see part 12 of this opinion, and tried them on the Machin auto on February 6. He found that there were keys to the ignition, doors, and trunk of the Cougar among the keys obtained from Mrs. Bruce. Appellant objected to this testimony on the ground that no chain of custody was established for the Machin automobile, and that the automobile itself was not introduced into evidence.

Quite apart from the manifest impracticality of introducing a Mercury Cougar into evidence, there is no rule of law requiring introduction of the car itself. As to the chain of custody, we said in *Coleman* v. *State,* (1975) 264 Ind. 64, 69-70, 339 N.E.2d 51, 55, "[T]he chain of

custody rule applies with diminishing strictness as the exhibits concerned become decreasingly susceptible to alteration, tampering, or substitution." (Citations omitted.) We find the danger of substitution of the locks of an automobile so insignificant that no reason exists to apply the chain of custody rule.

## G.

Finally appellant alleges that no sufficient chain of custody was shown for State's Exhibit 16, impressions of latent fingerprints taken by F.B.I. Agent Kasper from the Cougar. Kasper testified that he "lifted" the prints and gave the tape impressions to Agent Ivan on February 6 or 7. Ivan testified from notes on the evidence envelope that he received the impressions on February 6 from an "N. Coslet," whose initials appeared on the envelope. Appellant argues that this discrepancy destroys the chain of custody.

Kasper identified each impression that he had taken by placing his initials and the date on the tape itself; it was upon these tapes that the prints were impressed. He testified that there were other fingerprint tape impressions present in the envelope which he had not prepared. It was the entire envelope which was marked as Exhibit 16; the envelope was prepared by Ivan, who noted receiving prints from "N. Coslet" thereon.

Appellant's argument consists largely of rhetorical questions concerning Coslet's identity and his activities relating to the exhibit. This presupposes that "N. Coslet" ever possessed the prints lifted by Kasper. Since Kasper identified the print tapes by markings he had placed upon them, and testified that he gave those prints to Ivan, the trial court was justified in finding that Ivan's testimony was that he had received all the prints from Coslet, but was mistaken. In either case, no link of the chain is wholly missing; there is evidence that Kasper prepared the prints and gave them to Ivan, and that Ivan sealed them in an envelope, the

further custody of which is not questioned. The chain of custody of the prints was properly established.

## XV.

During appellant's trial for the Machin murders, CEP testified as a witness for the State. She stated that on December 7, 1973, she was visiting a friend, Bill Dunn, at the house Dunn was renting at the lakeshore near the Machin house. After dinner Dunn answered the door and a man identified by the witness as appellant entered carrying "a rifle or shotgun, a long gun." The man said he was looking for "Ron," whom he had been sent to kill. He ripped out the telephones and had CEP bind Dunn's wrists and ankles as Dunn lay on a bed.

The man took CEP to another room and had sexual intercourse with her, after making her undress. Afterwards the intruder had CEP rip up a blanket and use the shreds to further bind Dunn. He bound the woman with blanket strips and left her lying on a couch. At one point during the episode the man asked CEP if there were dogs in the house; later he offered her a cigarette.

There was medical opinion evidence that Mrs. Machin had sexual intercourse, probably with someone other than her husband, around the time of her death. Her body was found undressed. Mr. Machin's body was found bound with telephone and electrical cords, with a blanket wrapped around its feet, lying on a couch. Their telephone was ripped out. Both of the Machins were killed by shotgun blasts. The man who came to the Whitehouses' door evinced a fear of dogs. A dog was found closed in a bedroom; the Machins' son testified that the Machins owned a dog which they allowed the run of the house. Although the Machins did not smoke, a small cigar was found in their sink with a wrapper bearing the brand name "Robert Burns."

Appellant challenges the admissibility both of the testimony of CEP and evidence of Mrs. Machin's sexual activity as ir-

relevant and unduly prejudicial, in that such evidence did not tend to prove any fact in issue but instead tended to prove that appellant committed other uncharged offenses.

The State responds that the evidence was admissible to show identity, that is, to identify appellant as the man who killed the Machins.

As to evidence suggesting that appellant raped Mrs. Machin, we recognized in *Maldonado* v. *State*, (1976) 265 Ind. 492, 355 N.E.2d 843, 847, that " 'happenings near in time and place' which 'complete the story of the crime on trial by proving its immediate context' " (sometimes characterized as *res gestae*) are properly proved. See also *Thomas* v. *State*, (1975) 263 Ind. 198, 201, 328 N.E.2d 212, 213. The evidence that Mrs. Machin had sexual intercourse around the time of her death, together with other medical evidence tending to exclude the possibility that such intercourse was had with her husband, supported an inference that Mrs. Machin was raped by the murderer. This inference provides a possible motive for the murders. The evidence was admissible.

Evidence that appellant did the acts described by CEP tends to show that appellant committed separate, unrelated crimes. Evidence of separate offenses committed by the accused is generally inadmissible. *Maldonado* v. *State*, *supra*, at 355 N.E.2d 846, and cases cited. Such evidence is never admissible to prove the bad character or "criminal bent" of the accused. *Randolph* v. *State*, (1977) 266 Ind. 179, 361 N.E.2d 900, 901. But evidence of other conduct by the accused is admissible notwithstanding its tendency to show him guilty of other crimes if that evidence tends to prove a fact in issue and if its probative value outweighs its prejudicial effect. *Randolph* v. *State*, *supra; Cobbs* v. *State*, (1975) 264 Ind. 60, 338 N.E.2d 632.

One purpose recognized as valid for the introduction of evidence of other criminal conduct by the accused is to prove his identity as the perpetrator of the crime charged by show-

ing that the accused committed a similar offense, marked by "unique or unusual characteristics." *Cobbs* v. *State, supra* at 264 Ind. 63, 338 N.E.2d 634. "This test is satisfied if the two incidents are sufficiently similar to support an inference that the same person committed both, and if appellant is shown to have perpetrated the attack on [CEP]." *Randolph* v. *State, supra* at 361 N.E.2d 901.

Appellant objects that the extraneous criminal conduct proved here has no tendency to prove that he committed any of the elements comprising premeditated murder. It is true that the State sought to prove a different offense, rape, which shares no elements with premeditated murder. However, the evidence of appellant's conduct on December 7 tended to prove that appellant was the person who killed the Machins because of similarities of that conduct to actions which the jury could properly have inferred that the killer took at the Machin house during the period in which the killings took place.

CEP was attacked by a man armed with a rifle or shotgun; the Machins were killed with a shotgun. In each case telephones were ripped from the walls, and their cords used to bind the victims, who were made to lie on a couch or bed, and bound with their hands and feet together in a "jacknife position." CEP was taken to a separate room and forced to have intercourse with appellant; Mrs. Machin was found in a separate room under circumstances permitting an inference that she had intercourse there with her murderer. CEP was made to undress; Mrs. Machin's body was found naked. In neither case did the intruder take money from the victims. In each case there was some evidence that the intruder feared dogs. In each case the attacker chose an isolated, lakeshore residence.

Appellant points out several dissimilarities: no one was killed on December 7, no vehicle was stolen, no windows broken. These differences do not vitiate the general similarity of the two incidents. CEP testified that appellant threatened

to kill her and Dunn several times, but that his hostility diminished after CEP told him she "didn't hate him." Appellant's truck became stuck in a ditch around the time of the Machin killings; the jury could find that this event, not present December 7, caused appellant to take the Machins' car. One of the investigating officers testified that the rip in the Machins' screen door appeared to be pushed outward, rather than inward, and that broken glass was scattered on both sides of the door. From this testimony the jury could infer that the breaking was not the method of entry, but an attempt to simulate evidence of a burglary. Appellant also seeks to differentiate the common characteristics already discussed in rather fine detail. Suffice it to say that no two instances of human conduct are ever precisely identical. We believe that the cumulative weight of the "unique or unusual features" was such that those features were "unusual enough to be relevant in establishing identity." *Cobbs* v. *State, supra,* at 264 Ind. 63, 338 N.E.2d 634.

## XVI.

It is uncontested that appellant arrived in Alabama on February 5, 1974, that he secured employment on a tugboat on the Black Warrior River near Tuscaloosa, and that he was arrested by the F.B.I. on that boat on February 12. The State also called a bank teller who testified that around 12:30 or 1:00 p.m. on February 4, appellant closed his savings account, withdrawing $1,000.00 in cash. There was evidence that appellant was a commercial fisherman, a seasonal occupation. He obtained the tugboat job under his own name, and stayed with his sister and her family.

The court allowed the State to prove that appellant was arrested for unlawful flight and gave State's tendered final instruction no. 8:

"The flight of a person immediately after the commission of the crime with which he has been charged, if there was such flight, is a circumstance which may be considered by you with all the other evidence to aid you in determining his guilt or innocence."

Appellant objects to both the admission of evidence suggesting that he fled and the instruction on flight, arguing that the evidence lacks probative value and that the instruction was not appropriate to the evidence. The gravamen of this argument is that appellant's departure from Indiana and actions in Alabama do not constitute "flight" or "concealment" such as would indicate guilty knowledge on his part.

Appellant discerns several distinct categories of evidence which has been deemed sufficient to show flight, which he assumes are the exclusive categories of flight evidence. The facts of this case fit none of appellant's categories. It suffices to say that the existence of factual distinctions between this case and others in which evidence of flight has been held admissible and sufficient to support inferences of guilty knowledge is not dispositive of the issue.

> "We have held on a number of occasions that flight is competent evidence of the *consciousness of guilt.* Whether or not there has been a *flight in avoidance* or merely an innocent exit must be determined from the circumstances. If it may be fairly inferred from such circumstances that there was a flight in avoidance, such inference reinforces other legitimate inferences drawn from circumstantial evidence of guilt." (Citations omitted; emphasis in original.) *Frith* v. *State,* (1975) 263 Ind. 100, 111, 325 N.E.2d 186, (Prentice, J., concurring opinion.)

The evidence of appellant's exodus was capable of interpretation as either a "flight in avoidance" or an "innocent exit." Absenting oneself from the community in which a crime has been committed may imply guilty knowledge even though it does not evince the planning of an experienced criminal. The facts that appellant left Porter County at a time when only the murderer could know of the crimes, and that he withdrew a large sum in cash from the bank, support an inference that appellant fled. As appellant notes, the facts that he travelled under his own name, stayed with a relative, and worked at an occupation similar to his usual one militate against flight. But where reasonable jurors could place either of two differing interpretations upon

a set of facts, and one of those interpretations is material to an issue in the case, evidence of those facts is admissible and an instruction may be based upon it. Since the jury could reasonably interpret appellant's actions as flight in avoidance of prosecution, evidence of those actions was admissible, and an instruction on the inferences available from such evidence was proper.

## XVII.

Appellant next argues that several "evidentiary harpoons" and instances of prosecutorial misconduct warranted the withdrawal of the case from the jury and the declaration of a mistrial. In reviewing the propriety of the denial of a mistrial this Court determines whether the witness or prosecutor has injected improper matter into the jury's awareness, and if so, determines whether the effect of such improper matter being placed before the jury is to place the accused in "a position of grave peril to which he should not have been subjected." *Maldonado* v. *State, supra,* at 355 N.E.2d 848; *White* v. *State,* (1971) 257 Ind. 64, 78, 272 N.E.2d 312, 320.

## A.

The first instance complained of occurs in testimony of CEP, who testified that after appellant had her bind Dunn with the telephone cord "he proceeded to rape me." It is not clear what appellant's specific objection to this sentence is. Evidently appellant contends that even assuming the admissibility of evidence of the December 7 incident, the State was not entitled to characterize the act as "rape" because the evidence was admissible to prove appellant's identity as the killer of the Machins, not to prove the uncharged offense of rape. While this contention may be correct, we do not perceive that the use of the word "rape" placed appellant in grave peril. The State was properly allowed to show that appellant held CEP at shotgun-point and had sexual inter-

course with her. The jury is unlikely to have viewed this activity more favorably had it not been called "rape."

During CEP's testimony, after she had characterized appellant's weapon as a "shotgun or rifle . . . a long gun," the prosecutor asked her a question about "this person . . . with a shotgun." A question which misstates prior testimony is improper, but the misstatement was immediately brought to the attention of the court and jury by appellant's forceful objection. Appellant contends that this question caused "irreparable prejudice" but it seems unlikely that this misstatement significantly prejudiced appellant.

Moreover appellant takes exception to two leading questions by the prosecutor to CEP, which appellant characterizes as a "series" of leading questions. The questions were minimally leading, and did not constitute recitations of evidence by the prosecution to which the witness acceded. It is difficult to conceive how any prejudice at all to appellant could have resulted from these questions.

## B.

The F.B.I. agent who arrested appellant in Alabama testified that he arrested him for the federal offense of unlawful flight to avoid prosecution for a state charge, 18 U.S.C. § 1073 (1970). The testimony clearly indicated that the "state charge" was the one for which appellant was on trial. Appellant seeks to liken this testimony to that in *White* v. *State,* (1971) 257 Ind. 64, 272 N.E.2d 312, revealing other charges pending against appellant. All this testimony informed the jury was that (1) appellant was charged in Indiana, and (2) appellant had gone to Alabama. The first was obvious to the jury; whether the State was allowed to prove the second is considered elsewhere. There is, however, independent prejudice in the agent's statement; it conveyed to the jury the impression that the F.B.I. considered appellant's absence from Indiana "flight" evincing guilt. As such this statement is improper and the jury should have been admonished to dis-

regard it. We do not believe, however, that appellant was placed in grave peril by this testimony. *White* v. *State, supra.*

## XVIII.

### A.

Appellant contends that a fatal variance between pleading and proof in that the indictments charged appellant with first degree murder by "purposely and with premeditated malice" killing while the State's evidence proved, if anything, felony murder, killing "while perpetrating . . . rape." This is a false issue. The jury was instructed as to the elements of premeditated first degree murder only. On appeal the State does not seek to rely on the elements of felony murder to support appellant's convictions. The real issue is whether there was sufficient evidence of the elements of the crimes charged to support the jury's verdict finding appellant guilty of first degree murder. We turn to that issue.

### B..

Appellant challenges the sufficiency of the evidence to support his murder convictions.

The evidence most favorable to the State may be summarized as follows:

In the early morning of February 4, 1974, appellant was seen at the Whitehouse residence, approximately one-quarter mile from the Machin house; appellant told the Whitehouses he had been in an automobile accident.

In the early morning of February 4, a pick-up truck registered to appellant's wife was found in a ditch in Beverly Shores. Later that day the Machins' Mercury Cougar was found parked in Michigan City near appellant's residence. Appellant's fingerprints were found on the inside passenger window of the Cougar.

The Machins' bodies were found in their home in the afternoon of February 5. Both were shot in the head with a shot-

gun.  Mr. Machin had been tied up.  A shotgun shell casing was found near each body; these shells were of the same gauge, load, and manufacture.  One was identified by an expert as definitely having been fired from the shotgun purchased by appellant's wife and found in the garage at the residence of appellant and his family.  A box of similar shotgun shells was given to investigators at the Bruce home by Mrs. Bruce, and two more such shells were in the shotgun when it was found.

Mrs. Bruce also gave investigators a set of keys which fit the Machins' Cougar, and some articles of men's clothing which contained particles of glass identical to particles found in the Machin kitchen.  Appellant's fingerprint was found on the refrigerator in the Machin kitchen.

Sometime after noon, February 4, appellant closed his savings account at a Michigan City bank, withdrawing one thousand dollars in cash, and traveled to Alabama.  He remained there until his arrest February 12.

Expert medical testimony established that Mrs. Machin had sexual intercourse sometime near her death, probably not with her husband.  Appellant was identified as having sexually assaulted CEP, a visitor at a Beverly Shores residence near the Machin house, about two months before the murders.  Certain aspects of this assault resembled circumstances surrounding the Machin murders:  the assailant was armed with a shotgun or rifle; he ripped out telephones and used their cords along with blankets, to bind the victims; he seemed to fear dogs.

This evidence of appellant's guilt is entirely circumstantial.  Appellant challenges its sufficiency to show his identity as the murderer and to show premeditation.

"As we have often stated before, in reviewing the allegation of insufficient evidence this Court will not weigh the evidence nor resolve questions of credibility of witness, but will look to that evidence and the reasonable inferences therefrom which support the verdict of the jury. *Asher* v. *State,* (1969) 253 Ind. 25, 244 N.E.2d 89.  The conviction

will be affirmed if from that viewpoint there is evidence of probative value from which the trier of fact could reasonably infer the existence of each element of the offense beyond a reasonable doubt. *Smith* v. *State,* (1970) 254 Ind. 401, 260 N.E.2d 558." *James* v. *State,* (1976) 265 Ind. 384, 354 N.E.2d 236, 241.

Where the evidence of guilt is essentially circumstantial, the question for the reviewing court is whether reasonable minds could reach the inferences drawn by the jury; if so, there is sufficient evidence.

Appellant's argument that the evidence does not support the inference that he killed the Machins is three-pronged. He enumerates the items of circumstantial evidence established at trial and examines each to determine whether it individually will bear the whole weight of appellant's guilt. This is not the nature of circumstantial evidence; such evidence is better pictured as a web, the strength of which is determined not only by the strength of its component strands but also by their interrelationship. The evidence in this case, taken together, supports the inference that appellant killed the Machins. Appellant's argument that the evidence must show that he had the exclusive opportunity to commit the murders suffers from the same defect; it seeks to support the inference of appellant's guilt on the evidence of his presence in the Machin house alone. Appellant cites *Breedlove* v. *State,* (1956) 235 Ind. 429, 134 N.E.2d 226, for his proposition that the State must show an "exclusive opportunity," but the *Breedlove* court recognized the flaw in appellant's argument. Only when the State relies *solely* on evidence of opportunity to commit the crime to establish the identity of the accused as the guilty party must it show that his opportunity was exclusive; evidence of a nonexclusive opportunity may combine with other evidence of guilt to support a guilty finding. 235 Ind. at 433, 134 N.E.2d at 228.

Finally appellant offers alternative explanations of the evidence which are consistent with his innocence. This approach would require us to weigh the evidence in contravention of the

limitations of appellate review. The question before this Court is not whether the jury could reasonably have accepted constructions of the evidence implying the innocence of appellant, but whether they could reasonably have accepted one of his guilt. *Beard* v. *State,* (1975) 262 Ind. 643, 323 N.E.2d 216.

### C.

Regarding premeditation, appellant posits a total absence of evidence. The State counters that "premeditation may be inferred from circumstantial evidence," a proposition of undoubted validity and dubious utility in resolving this issue in this case.

The evidence suggests that both Mr. and Mrs. Machin were shot in the head, at close range, with a shotgun. Mr. Machin was bound. These facts reasonably support an inference of premeditation in that they bespeak an execution, an orderly conducted slaying which implies forethought and planning.

### D.

Appellant also argues that, by virtue of his pleading an alibi, the State was required to prove that the murders occurred on February 4, 1974, as stated by the prosecutor's response. He asserts an absence of proof of the time of the killings. In *Woods* v. *State,* (1968) 250 Ind. 132, 235 N.E.2d 479, the Court noted:

"It has been recognized at least twice by this Court that where time is not of the essence of the offense, even though the allegation specifies the crime to have occurred on a specific date, the State may prove that the crime occurred at any time prior to the filing of the affidavit or indictment and within the statutory period of limitations. However, these same cases recognize that this general rule yields to a requirement of specific proof where the 'alibi statutes', *supra,* are invoked. *Stallings* v. *State* (1953), 232 Ind. 646, 114 N.E.2d 771; *Evans* v. *State* (1946), 224 Ind. 428, 68 N.E.2d 546. *Where there is a substantial variation between the time of the crime charged in the indictment or affidavit,*

*and the time of the crime as shown by the State's evidence, and defendant is relying upon an alibi, it appears that upon timely motion by defendant a continuance should be granted. Stallings v. State, supra;* Note, *Criminal Law: Statutory Regulation of Alibi Defense Through Notice Requirements,* 30 Ind. L.J. 106, [113] (1954-55)." 250 Ind. at 143, 235 N.E.2d at 485 (Emphasis added.)

If appellant deemed the State's evidence fixing the time of the murders to be insufficiently specific to permit him to utilize his alibi evidence, he should have sought a continuance to gather evidence to meet the period of time for which he had not previously accounted. His conviction will not be reversed for the State's failure to exclude the possibility that the murders occurred other than on the 4th.

## XIX.

Appellant objects to State's instruction no. 2, which was given to the jury. Instruction no. 2 defined the element of "malice" thus:

"Malice, in law and as used in the statutes defining murder, either in the first or second degree, has a technical meaning, including not only anger, hatred, and revenge, but also *every other unlawful and unjustifiable motive.* It is used and intended to denote an action arising from any wicked and corrupt motive, a thing done with bad or malicious intent and accompanied by such circumstances as carry in them the plain indication of a heart devoid of concern for social duty and fatally bent on mischief." (Emphasis added.)

Appellant objected at trial because this instruction was not supported by the evidence. On appeal he adds to this objection two arguments that the instruction's definition of malice was inadequate, incorrect, and misleading. Indiana R.Crim. P. 8(B) requires a party to make specific objection to an instruction at trial. "No error with respect to the giving of instructions shall be available as a cause for new trial or on appeal, except upon the specific objections made as above required." Ind. R.Crim. P. 8(B).

Appellant's argument that the evidence does not support the giving of this instruction turns on the use of the word "motive." "There is a total absence in the Record of any motive by the Appellant to kill either victim." Appellant has confused two distinct uses of the term "motive." The State is allowed, but not required, to prove that an accused had some understandable reason for committing the crime charged, because such evidence has probative value in determining whether he committed that crime. See 1 J. WIGMORE, Evidence §§ 117, 118 at 557-59 (3d ed. 1940). The instruction does not presuppose that the State has proven a motive in this sense. Rather it instructs the jury that if they find that appellant killed the Machins for any unlawful and unjustifiable reason they could find that he did so with malice. Proof of a particular motive for the murders is not necessary to the propriety of giving an instruction such as this.

Appellant also objected to the State's tendered final instruction no. 1, defining premeditation, contending that the instruction implied to the jurors that they were required to find premeditation. On appeal we are favored with no argument or authorities in support of this proposition and therefore will not consider it. Ind. R. Ap. P. 8.3(A)(7).

## XX.

The State offered evidence that fingerprints matched with appellant's were found on the refrigerator in the Machins' kitchen and in the Machins' Cougar. Appellant tendered a lengthy instruction on the reception of fingerprint evidence, most of which was given by the court. The instruction stated in relevant part:

"In order for a fingerprint to have probative value as to proof that the Defendant had been at the scene of the crime, the prosecution,

1) Must establish that the Defendant's prints were impressed at or about the time the homicides were committed.

2) Or must be [sic] other circumstances that indicate the impression was made at that time and must exclude all reasonable theories of the Defendant's innocent presence.

[3) Must explain and/or identify all fingerprints belonging to other people.

4) Must show that the place where the Defendant's fingerprints were found was inaccessible to the public and must exclude all reasonable theories of the Defendant's lawful presence.]

If the prosecution fails to establish all of these two (2) requirements; the jury is instructed that a conviction in this case cannot be supported by fingerprint evidence alone.

If the prosecution fails to establish any of the two (2) requirements listed above, the jury will determine what weight, if any, the evidence may have. Further, upon the failure to prove any of the above-listed requirements, the jury would be justified in giving no probative value to this evidence." (Lines in brackets deleted by trial court.)

The trial court gave the instruction after striking the paragraphs numbered (3) and (4). Appellant complains that these paragraphs correctly stated the law and that he was prejudiced by their deletion.

A fingerprint impression identified as matching the fingerprint of an individual is circumstantial evidence that the individual came into contact with the surface upon which the print is impressed, 2 J. WIGMORE, Evidence § 414 at 389 (3d ed. 1940). A fingerprint thus permits an inference to be drawn linking the accused to an object or a place. However, the efficacy of fingerprint evidence to support the further inference that the accused committed the crime charged varies with the circumstances surrounding its impression. See Anno. 28 A.L.R.2d 1115, 1150-57 (1951).

It is appropriate for the trial court to instruct the jury as to circumstances affecting the validity of an inference of guilt from fingerprint evidence, since jurors may find themselves overwhelmed by this type of forensic technology. Appellant's instruction lists numerous circumstances enhancing the probative value of fingerprints to establish guilt. Paragraphs

(3) and (4), deleted by the trial court, went too far in requiring the prosecution to explain or identify all fingerprints belonging to other people and to show that the prints were found in a place inaccessible to the public, and in instructing the jury to totally disregard fingerprints if the prosecution failed to do so. The instruction as tendered goes too far and would deny fingerprint evidence its legitimate weight. The instruction would properly have been refused, and appellant was not prejudiced by so much as was given.

A court could properly instruct the jury that the weight to be given fingerprint evidence depends upon the circumstances surrounding their impression. The jury could also be instructed that in themselves, fingerprints serve only to link their owner with the surface upon which the prints are found.

## XXI.

### A.

Appellant sought to procure the attendance of one Juan (or John) Hernandez, a friend of appellant, as a witness. According to an affidavit by defense counsel, Hernandez was jailed in Tuscaloosa, Alabama, on a burglary charge. The affidavit further recited that appellant was unable to produce Hernandez but that "procedures and means" for his production were available to the State. Appellant tendered a final instruction that the nonproduction of a witness by a party able to produce him gives rise to a presumption that the testimony of that witness would be unfavorable to the party which could have produced him.

The "missing witness" instruction is appropriate only where the witness is available to be produced by one party but not by the other. *Banks* v. *State,* (1976) 265 Ind. 71, 351 N.E.2d 4, 19. We find the question of the availability of Hernandez to the State to be one of law and we are not bound to accept appellant's conclusory assertion that the State could produce him.

A review of Alabama law reveals no provision for the compulsion of Alabama residents to appear as witnesses in courts of other states. Alabama has not enacted the Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases, enacted in this State as Ind. Code §§ 35-6-2-1 to 5 (Burns 1975). See Table, II Uniform Laws Annotated 7 (West 1977 Supp.). It does not appear that Hernandez was available to be produced by the State. Therefore appellant's instruction was properly refused.

### B.

Appellant tendered an instruction charging the jury:

"The prosecution has the duty to introduce all the evidence in their possession or of which they have knowledge. The failure of the prosecution to bring before the jury all the evidence collected in this case may be cause for the jury to infer that this evidence may show the innocence of the Defendant or be favorable to him in that it shows the crime may have been committed by another person not the Defendant. The State has presented testimony that certain scientific tests were performed upon certain items of evidence. The jury is instructed that the failure to perform certain tests on certain items of evidence may create and would support an inference that if those tests had been performed on said pieces of evidence, the result may have been consistent with the Defendant's innocence.

Further, there has been testimony that certain items of evidence collected by the police were destroyed without having undergone scientific tests and that the police failed to collect certain pieces of evidence at the scene of the crime. The jury is instructed that these failures and omissions may create and would support an inference that those items and the results of any scientific tests performed upon them may have been favorable to the Defendant and consistent with the Defendant's innocence."

Among the "certain tests" not performed by the State appellant places: (1) tests for powder residues on appellant's clothing; (2) unspecified tests on the victims' fingernail scrapings; (3) unspecified tests on a handkerchief found near one of the bodies. There is some indication in the record that

some evidence which was collected by the various law enforcement agencies investigating these murders was not brought to court, and that some of it may have been lost. We find and are directed to no indication that any evidence was destroyed by any representative of the state or federal government.

Appellant's statement of the prosecutor's duty is incorrect. *Tope* v. *State,* (1977) 266 Ind. 239, 362 N.E.2d 137, 143. His instruction also misstated the evidence in asserting that evidence had been destroyed by the police. However, even if the tendered instruction had been more artfully drafted, the inference stated in the instruction would not have been appropriately applied to the facts of this case. An instruction calling for an adverse inference to be drawn from the failure to produce evidence is appropriate only where the evidence withheld is material to the trial issues, and not cumulative. *Timm* v. *State,* (1976) 265 Ind. 537, 356 N.E. 2d 222; *Gatchett* v. *State,* (1973) 261 Ind. 109, 300 N.E.2d 665. There is no indication that the evidence and tests referred to in the instruction satisfy these criteria.

## XXII.

Appellant tendered his instruction no. 5 dealing with the standard of proof beyond a reasonable doubt. The trial court gave this instruction but deleted this sentence: "The prosecution must exclude the possibility that someone else other than the Defendant committed the crimes charged herein beyond a reasonable doubt." This sentence embodies appellant's "exclusive opportunity" theory, which is discussed in the review of the sufficiency of the evidence.

Those portions of instruction no. 5 which were given more than adequately instructed the jury that the State was required to prove beyond reasonable doubt that appellant committed acts constituting the elements of the offenses charged. Exclusion of the possibility that anyone else committed those acts is simply indirect proof of appellant's guilt. The State is not required to prove guilt

indirectly, by eliminating alternative possibilities. It is required to prove guilt beyond reasonable doubt, by direct or indirect means, or a combination of both. The deleted sentence is misleading and was properly deleted.

## XXIII.

Following the jury's verdicts of guilty appellant petitioned the trial court for examination under the Criminal Sexual Deviancy Statute, Ind. Code §§ 35-11-3.1-1 to 37 (Burns 1975). Appellant argues that he "committed a 'sexual offense' because the murders were committed with a sexual motive." He does not explain how the murders were sexually motivated, but we need not consider whether they were. Section 35-11-3.1-1(a) defines a criminal sexual deviant as a person who is convicted of "a sexual offense or an offense which directly involved the commission of an illegal sexual act," and who meets certain other qualifications. Sections 35-11-3.1-2 and 2.1 except certain offenses, acts, and persons from operation of the statute. Appellant complied with the procedural requirements of the statute and is not exempted from eligibility for treatment by sections 2 or 2.1. Therefore appellant was entitled to be examined under the statute if he satisfied the statutory definition of a criminal sexual deviant.

This Court has chiefly considered the meaning of the phrase "sexual offense or an offense which directly involved the commission of an illegal sexual act" in kidnapping cases. In *Pieper* v. *State,* (1975) 262 Ind. 580, 588, 321 N.E.2d 196, 200, the Court held:

> "The statute does not require the trial court at the discharge hearing to relieve the successfully treated criminal sexual deviant from further incarceration for other offenses, even though as here, they occurred at the same time as the sexual offense and were partly or wholly motivated by a desire to carry out a plan to commit a sexual offense."

Accord, *Warner* v. *State,* (1976) 265 Ind. 262, 354 N.E.2d

178, 185; *Critchlow* v. *State,* (1976) 264 Ind. 458, 473, 346 N.E.2d 591, 600.

In *Adams* v. *State,* (1976) 265 Ind. 129, 352 N.E.2d 490, 493, we said:

> "Ind. Code § 35-11-3.1-3 (Burns 1975) provides that a conviction for a sex offense is a precondition to eligibility to petition thereunder. Although the defendant's crimes [kidnapping] were incident to the accomplishment of acts of sexual deviancy the crimes themselves are not sex offenses within the clear meaning of the statute."

If kidnapping is not a sexual offense regardless of its motivation or of the factual nexus binding it to sexual acts, it must follow that premeditated first degree murder is not a sexual offense either, regardless of the motive with which appellant committed it.

The trial court properly denied appellant's petition for treatment under the criminal sexual deviancy statute.

## XXIV.

After appellant was arrested in Alabama and returned to Porter County, he was exhibited in a line-up to CEP and her friend William Dunne, who both identified him as the man who held them at gun point and raped CEP.

Appellant moved to suppress the identification testimony of these witnesses in both his murder and rape trials. Although the trial court denied the motion summarily in the murder prosecution, the court to which the rape prosecution was transferred pursuant to appellant's motion for change of venue held a full hearing before denying appellant's motion. Both Dunne and CEP identified appellant in the rape trial and described having done so at the line-up, all over appellant's objection.

The evidence received at the suppression hearing indicated that the witnesses recognized appellant when his photograph appeared in the newspaper following his arrest in Alabama. They contacted the investigating officers, who arranged for a

line-up to be held on February 28, 1974. At this time appellant had been charged with the Machin murders, and appeared in court and the public defender had been appointed to represent him. He had not been charged with the rape and was being held on the other charges.

Appellant first contends that the line-up was conducted so as to deprive him of the assistance of counsel. This argument has two prongs, each a necessary condition to its success:

(1) The line-up must be found to have occurred at a time when appellant was entitled to the presence of counsel, and (2) that appellant did not execute a valid waiver of the right to have his attorney present. (See part III of this opinion, *supra*.)

In *Kirby* v. *Illinois*, (1972) 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, the Supreme Court held that the right of a suspect to the presence of counsel at a line-up attaches at the initiation of adversary judicial proceedings against the accused. In *Winston* v. *State*, (1975) 263 Ind. 8, 323 N.E.2d 228, this Court held that formal judicial proceedings against the accused commence with the filing of the indictment or information; the right to counsel attaches at that point. Appellant was not charged with the rape until six days *after* the line-up. He had no right to counsel with respect to the rape charges.

Appellant contends that *Kirby* and *Winston* do not apply when the police purposefully defer formal charging in order to evade the requirement of the presence of counsel. Assuming that this contention is correct, we find no indication in the record that such purposeful evasion took place; the investigating officer testified that he arranged the line-up identification in order to provide probable cause for formal charging, and the probable cause affidavit accompanying the informations indeed relied on the line-up evidence.

Our decision is supported by a distinct alternative rationale. The entire line-up proceeding was recorded on video tape,

and played for the trial court at the suppression hearing. The role of an attorney at a line-up differs from his usual role as counsel for the criminal defendant. A suspect in custody has no choices to make, and his attorney does not function in the usual advisory fashion. Rather the line-up role of counsel is essentially that of witness to the procedure, to permit reconstruction of that procedure and to deter abuses.

The presence of counsel at a line-up is a means to the end of preventing suggesting influences, or alternatively, of exposing any such influences to the court and jury. *United States* v. *Wade, supra,* 388 U.S. at 236, 87 S.Ct. at 1937. See Davis & Uviller, *The Role of the Defense Lawyer at a Line-Up in Light of Wade, Gilbert, and Stovall Decisions,* 4 Crim. L.Bull. 273, 278-86 (1968). *Wade* expressly left open the possibility that:

> "[l]egislative or other regulations, such as those of local police departments, which eliminate the risks of abuse and unintentional suggestion at line-up proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as 'critical'. . . . What we hold today 'in no way creates a constitutional straightjacket which will handicap sound efforts at reform. . . .'" 388 U.S. at 239, 87 S.Ct. at 1938-39.

Among the proposals cited with approval by the *Wade* court was the recommendation of sound and visual recording of the procedure. 388 U.S. at 236, n. 26, 87 S.Ct. at 1937.

The existence of a videotape recording will insure accurate reconstruction of the line-up and deter abuses no less effectively than the witnessing of the procedure by the suspect's counsel. Human perception of events may vary even among intelligent, alert, and conscientious observers, see *Whitt* v. *State,* (1977) 266 Ind. 211, 361 N.E.2d 910, 917; electronic recording provides an objective and reliable reconstruction.

We hold, therefore, that an identification proceeding preserved on video tape is not a "critical stage" within the meaning of *Wade,* as an independent basis for our decision that the

trial court was correct in denying appellant's motion to suppress.

Appellant also contends that the line-up was the product of his unlawful detention, in that he was not charged with the rape until March 6, approximately one week after the line-up. This contention ignores the fact that appellant was in lawful custody based upon the murder indictments returned in the Machin case on February 5, 1974. We are aware of no authority preventing the police from investigating uncharged crimes while their suspect is incarcerated on other charges.

## XXV.

Appellant contends that his prosecution and conviction for the same acts to which CEP was allowed to testify in his murder trial subjects him to double jeopardy and denies him due process. He also requests the Court to hold as a matter of Indiana law that the use of CEP's testimony in the murder trial bars his rape conviction.

## A.

Double jeopardy prohibits, *inter alia,* multiple punishment for the same crime. *North Carolina* v. *Pearce,* (1969) 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656. The test for determining whether two offenses are the "same offense" was recently repeated by the Supreme Court in *Brown* v. *Ohio,* (1977) 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187:

> " 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. . . .' [Quoting *Blockburger* v. *United States,* (1932) 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306] This test emphasizes the elements of the two crimes. 'If each requires proof that the other does not, the *Blockburger* test is satisfied, *notwithstanding a substantial overlap in the proof offered to establish the crimes.* . . .'

*Ianelli* v. *United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1294, 43 L.Ed.2d 616 (1975)." (Emphasis added.)

This quotation succinctly disposes of appellant's contention that he was subjected to double jeopardy by "being punished twice upon the same evidence and essentially the same offense." Appellant was not "twice punished" for the rape of CEP.

### B.

Appellant also asserts that due process is violated by admission of evidence in one prosecution of evidence of an offense which is the subject of a separate, pending, prosecution. In support of this proposition he cites a federal case concerned with whether and to what extent the Double Jeopardy Clause applies to the states. He also refers to the "conduct which shocks the conscience" standard of *Rochin* v. *California,* (1952) 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183. We are unable to see how the reception of relevant evidence "shocks the conscience" or otherwise denies appellant due process.

### C.

Appellant finally requests this Court to hold that the use of CEP's testimony regarding the December 7 rape in appellant's murder trial "resulted in a merger of that testimony into the . . . sentences Appellant received as the result of the two murder convictions." "Merger" refers to the absorption of one offense into another. Black's Law Dictionary 1140 (4th ed. 1957). We take appellant's assertion that testimony should "merge" to suggest that the State should be allowed to use a given item of evidence in one prosecution only, and thereafter should be barred from using it. We find no merit in this suggestion. A criminal offender is punished for his actions (and relevant mental states), not for the evidence used to prove those actions. Evidence relevant to the proof of more than one offense may be used wherever it is relevant in the legal sense; such use in no way offends justice.

## XXVI.

Appellant was convicted of rape, Ind. Code § 35-13-4-3 (Burns 1975) and commission of a felony (rape) while armed with a deadly or dangerous weapon, Ind. Code § 35-12-1-1 (Burns 1975) both repealed October 1, 1977. He received consecutive sentences of one indeterminate two to twenty-one year term (rape) and one determinate twenty-five year term (armed rape) pursuant to the armed felony statute's consecutive sentencing provisions, which read:

> "Provided, That such court shall have the right to provide in the judgment that such term of imprisonment shall not run concurrently with any imprisonment that may be adjudged for any *additional crimes being attempted or committed at the same time* but that such term of imprisonment shall commence at the expiration of the imprisonment adjudged for any such additional crimes." (Emphasis added.) Ind. Code § 35-12-1-1.

Both the rape and armed rape charges referred to the same date, December 7, 1973, and the same victim. There was evidence that appellant committed two separate acts of intercourse with the same victim, each forcibly and against her will. In each case he was armed with a shotgun.

Appellant argues that consecutive sentencing for the rape and armed rape was improper. Either the two sexual assaults constituted the same offense, in which case the rape would constitute a lesser included offense of the armed rape, *Hudson* v. *State*, (1976) 265 Ind. 302, 354 N.E.2d 164, or they constituted separate offenses which did not occur at the same time, in which case the consecutive sentencing provisions of the armed felony statute do not apply. See *Coleman* v. *State*, (1975) 264 Ind. 64, 339 N.E.2d 51.

We agree that one or the other of the above interpretations must be correct, and in either case consecutive sentencing would not be appropriate. If the two assaults constituted but one offense, then the rape conviction and sentence must be vacated. *Hudson* v. *State, supra.* If

they constituted separate offenses one may support each conviction, but the judgment must be modified to impose concurrent sentences.

We conclude that the two instances of forcible intercourse are separate offenses. The Legislature has defined rape as "carnal knowledge of a woman forcibly against her will." Ind. Code § 35-13-4-3 (Burns 1975). Rape is proved when the State shows penetration forcibly and against the will of the woman. *Dixon* v. *State,* (1976) 264 Ind. 651, 657, 348 N.E.2d 401, 405. Two such acts occurred in this case. One of these offenses was subsidiary to the armed rape charge.

The case will be remanded to the Cass Circuit Court for modification in accord with this section of the opinion.

Appeal No. 1075 S 261 is affirmed. Appeal No. 776 S 227 is remanded to the Cass Circuit Court with instructions to vacate the sentences imposed upon appellant's convictions and to impose concurrent sentences upon appellant. Otherwise the convictions are affirmed.

Prentice, J., concurs; Givan, C.J., concurs in result with opinion in which Hunter, J., concurs; Pivarnik, J., not participating.

## OPINION CONCURRING IN RESULT

GIVAN, C.J.—I concur in result. The majority opinion under XII, after describing the finding of the shotgun, concludes "These circumstances could not give rise to probable cause to conduct a search, . . ." I disagree with this conclusion. I would hold that there was probable cause to conduct a search. I do agree that a search in fact was not made.

Hunter, J., concurs.

NOTE.—Reported at 375 N.E.2d 1042.